PETER AGULLÓ, demandante y recurrido, *v.* ADMINISTRACIÓN DE SERVICIOS AL CONSUMIDOR (hoy DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR), demandada y recurrente.

*Número:* O-74-364        *Resuelto:* 16 de octubre de 1975

*Reinaldo Rodríguez Pagán, Wilfredo López Irizarry, Rosa E. Palou, Migdalia Fraticelli Torres, Samuel Martí Santiago, Yusif Mafuz Blanco, Mario Batiz Santos y Reinaldo Salas*

*Soler,* abogados de la recurrente, hoy Departamento de Asuntos del Consumidor; *Jorge Benítez Gautier,* abogado del recurrido; *Enrique Cornier Martínez,* abogado del interventor Rudolf Benes.

PER CURIAM: Este caso nos hace examinar una vez más las facultades que la ley le confiere al administrador de la Ley de Alquileres Razonables y aquellas que no le confiere. Ya antes lo hicimos, en parte, en *Vda. de Hernández* v. *Pérez Colón, Admor.,* 94 D.P.R. 807, 814 (1967); en *Blanco Rojo* v. *A.E.E.,* 96 D.P.R. 231 (1968); y en *B. Fortaleza Corp.* v. *Bouzá,* 101 D.P.R. 270 (1973). Vamos al caso de autos.

En 24 de octubre de 1960, Pedro Agulló, arrendador, alquiló a Rodolfo Benes una residencia sita en la Calle Bucaré del barrio residencial Punta Las Marías, de Santurce, P.R., por un canon mensual de $275. Benes pagó dicho canon durante doce meses, pero comenzando en 24 de octubre de 1961, mediante acuerdo de las partes, el canon se redujo a $250 mensuales. Benes pagó dicho nuevo canon durante diez años diez meses, esto es, hasta el 24 de julio de 1972. El largo tiempo durante el cual el inquilino disfrutó de la vivienda próxima al mar, a pesar del auge que se operó en la construcción y en la oferta de viviendas en Santurce durante esos años, demuestra prima facie que se encontraba a gusto en ella.

Varios meses antes de julio de 1972, la última fecha antes mencionada, el arrendador inició una acción de desahucio contra Benes. Posteriormente éste presentó, en mayo de dicho año, una querella contra Agulló ante la entonces Administración de Servicios al Consumidor, hoy Departamento de Asuntos del Consumidor, solicitando el reembolso del exceso del alquiler pagado durante los 12 años que había vivido en la propiedad. El Administrador declaró con lugar la querella y ordenó a Agulló que le reembolsase $13,740 al inquilino. Se basó el Administrador en que en el año 1958 la Administra-

ción de Estabilización Económica le había fijado un canon de
$145.00 mensuales a esa residencia.

El Tribunal Superior revocó la orden del Administrador
por entender que éste carecía de jurisdicción sobre esa vivien-
da en 1972, cuando dictó la orden, ya que el canon era para
esa fecha de $250 mensuales y la Ley Núm. 67 de 19 de junio
de 1964, 17 L.P.R.A. sec. 184(b), había eximido de la Ley
de Alquileres Razonables a las viviendas cuya renta fuese
de $200 o más por mes.

■ La decisión de la ilustrada Sala sentenciadora es
correcta en cuanto a los alquileres pagados después del 19 de
junio de 1964, fecha en que fue aprobada y comenzó a regir
la citada Ley Núm. 67. Esa ley, en efecto, eximió del control
de la Ley de Alquileres Razonables a las viviendas cuya renta
mensual fuese de $200 o más y hemos resuelto que dicha
Ley Núm. 67 opera de pleno derecho, esto es, por sí misma,
por haberla aprobado la Asamblea Legislativa y el Goberna-
dor, y, desde luego, sin que fuese necesario para su vigencia
el visto bueno del Administrador. *Vda. de Hernández* v. *Pérez
Colón, Admor.*, supra; *Blanco Rojo* v. *A.E.E.*, supra; *Flores*
v. *Flores Toledo*, 101 D.P.R. 61, 66 (1973); *B. Fortaleza
Corp.* v. *Bouzá*, supra.

Veamos ahora la situación en cuanto a los cánones paga-
dos desde el 24 de octubre de 1960, fecha en que el inquilino
tomó la propiedad, hasta el 19 de junio de 1964, fecha de
vigencia de la Ley Núm. 67. En cuanto a esta situación debe-
mos preguntarnos ¿puede el inquilino recobrar en el año 1972
los cánones pagados en exceso durante el período compren-
dido entre el 24 de octubre de 1960 hasta el 19 de junio de
1964? Trascendiendo el problema al plano de norma general,
¿puede un inquilino esperar diez años para recobrar de su
arrendador por dicho concepto?

Las contestaciones a las anteriores preguntas deben ser en
la negativa. Razones de necesidad y utilidad social han hecho

necesaria y conveniente la prescripción de las acciones. Como señala Castán, por la prescripción se asegura la estabilidad de la propiedad y la certidumbre de los demás derechos. Añade dicho autor que "La economía y la vida jurídica sufrirían grave quebranto si el estado de hecho, representado por el ejercicio o no ejercicio de un derecho, no viniere a convertirse por el transcurso del tiempo en un estado de derecho inatacable." (¹) V. además *Ríos* v. *Banco Popular*, 81 D.P.R. 378, 395 (1959).

■ Las acciones prescriben porque no se debe dejar a las personas expuestas por toda la vida, o por largo tiempo, a ser demandadas cuando ya creen que ha sido aceptada o curada la situación que podía dar lugar a un litigio. Pasado largo tiempo generalmente han encauzado su vida y sus asuntos sin tener en mente y sin preveer la catástrofe que un pleito significa. Diez Picazo, en su obra *La Prescripción en el Código Civil*, (1964), a la pág. 56, lo explica de la siguiente forma:

"En la prescripción se protege sobre todo—lo he dicho ya— un interés particular muy concreto: el interés de la persona de no verse expuesta a reclamaciones antiguas, de las cuales se ha perdido la memoria, porque el silencio ha creado una objetiva y razonable confianza de que el derecho o la facultad no serían ya ejercitados."

Coviello expresa que a causa de la inercia prolongada del titular del derecho se extingue el derecho mismo. (²)

■ Como en la Ley de Alquileres Razonables no existe una disposición prescribiendo un término para el reembolso obligatorio de cánones pagados en exceso, debemos recurrir al Código Civil como derecho supletorio. Art. 12 del Código Civil; *Dalmau* v. *Hernández Saldaña*, 103 D.P.R. 487 (1975), y autoridades allí citadas. Se ocupa el Código de la prescrip-

---

(¹) Castán, *Derecho Civil Español, Común y Foral*, 10ma. ed. revisada (1963), Tomo I, Vol. 2, pág. 834. En la 11ma. ed. (1971), también pág. 834.

(²) Citado en G. Velázquez, *Las Obligaciones Según el Derecho Puertorriqueño* (1964), pág. 238.

ción en el Título 18 de su Libro IV, 31 L.P.R.A. secs. 5241 a 5305.

■ En su Art. 1866, 31 L.P.R.A. sec. 5296, el Código dispone que por el transcurso de cinco años prescriben las acciones para exigir el cumplimiento de la obligación de satisfacer el precio de los arriendos, sean éstos de fincas rústicas o urbanas. No dice—ni lo prohíbe—que dicho plazo incluya el término para recobrar el importe de los arriendos cobrados en exceso. Probablemente no se ocupó el Código de esto por la razón de que cuando se redactó no existía, desde luego, la ley española de Arrendamientos Urbanos y el problema no se planteaba. Sin embargo, el problema se nos plantea ahora en vista de que tenemos esta materia regulada por una ley especial—la de Alquileres Razonables—y ésta adolece de esa laguna. Visto lo antes dicho podemos y debemos suplir dicha laguna interpretando el citado Art. 1866 del Código Civil en el sentido de que el mismo incluye el precio de los arriendos cobrados en exceso. (³) La anterior interpretación del Art. 1866 es equitativa pues ya que el arrendador tiene cinco años para reclamar la renta, es razonable que el inquilino también disponga de igual plazo para reclamar los alquileres pagados en exceso.

El siguiente razonamiento de Diez Picazo, obra citada, pág. 181, en torno al Art. 1966 del Código Civil Español, equivalente al 1866 del nuestro, encaja perfectamente dentro de nuestro enfoque a este asunto. Expresa dicho autor que el propósito del citado artículo es

"[I]mpedir que los deudores se vean perjudicados, mediante una continua y sucesiva acumulación de pagos, que puede incluso,

---

(³) Sobre el problema de las lagunas del derecho positivo véase nuestra discusión en *Borges* v. *Registrador*, 91 D.P.R. 112, desde la pág. 132 *in fine* hasta la 134. También véase la sec. III, Cap. V de Castán, *Teoría de la Aplicación e Investigación del Derecho*, Madrid, Instituto Editorial Reus, 1947. Sobre el mismo problema en relación con la Ley de Arrendamientos Urbanos, véase Castán, en su tratado citado en el escolio 1 de esta opinión, Tomo IV, 9na. ed. revisada (1961), págs. 321 y 322.

250

en ocasiones, conducirles a la ruina, porque, si el pago distanciado y periódico de pequeñas sumas es algo que cabe casi siempre dentro de las fuerzas o de las posibilidades económicas del deudor, en cambio la conversión de estas pequeñas deudas temporalmente distanciadas en una única deuda acumulada, de mayor importe, por obra de la voluntad del acreedor, que deja intencionadamente de reclamar las prestaciones durante algún tiempo, puede conducir a graves perjuicios."

En materia de arrendamientos urbanos el derecho español da vigencia al principio de equidad condenatorio del abuso del derecho. Como señala Castán al respecto, "los Jueces y Tribunales desestimarán las pretensiones que ante ellos se formulen, por demandante o demandado, con manifiesto abuso de derecho." [4]

■ Además de que la equidad es principio rector del derecho, nuestro derecho positivo contiene frecuentes referencias expresas a dicho valor jurídico-moral. Así, por ejemplo, el Código Civil, en su Art. 1108 autoriza al juez a modificar equitativamente la sanción económica cuando la obligación principal hubiera sido cumplida en parte por el obligado. 31 L.P.R.A. sec. 3133. El Art. 1056 permite al juez moderar la responsabilidad que proceda de negligencia en el cumplimiento de las obligaciones. 31 L.P.R.A. sec. 3020. Para otros preceptos del Código que remiten expresa o tácitamente a la equidad, pueden verse los Arts. 1801, 1598, 1581, 332, 1617, 1210, 1057, 1445, 1701 y 1789. Para una discusión más amplia, véase *Don Quixote Hotel* v. *Tribunal Superior*, 100 D.P.R. 19 (1971), a las págs. 28 y 29.

Nuestra Ley de Alquileres Razonables fija como "alquiler básico" el que se pagaba el primero de octubre de 1942. De eso hace 33 años. Para aquella época el salario de los obreros de la construcción era de 25 centavos de dólar la hora. [5] Los

---

[4] Véase obra citada, Tomo IV, 9na. ed. revisada (1961), pág. 324 y autoridades allí citadas.

[5] Géigel Polanco, *Legislación Social de Puerto Rico*, ed. de 1944, pág. 140.

Decretos Mandatorios de salario mínimo comenzaron a regir en junio de 1946. Para ese año el salario mínimo de los obreros diestros de la industria de la construcción—carpinteros, plomeros, pintores, electricistas y albañiles—era de 60 centavos la hora. El de los obreros no diestros de dicha industria era de 32 centavos la hora.

En aquella economía un canon mensual de $145.00 para la residencia en cuestión probablemente era razonable. Pero consideremos los cambios ocurridos. Al presente el salario mínimo de los obreros de la industria de la construcción es de $1.95 la hora. El aumento, en los salarios solamente, desde el 1946 ha sido de 325 por ciento. En cuanto a otros renglones podemos tomar conocimiento judicial del gran aumento que se ha registrado durante esos 33 años en el precio del terreno, en las contribuciones sobre la propiedad, en las primas de seguros, en el interés sobre el dinero y en el precio de los materiales de construcción, de reparación y de mantenimiento de casas—varillas, madera, herrajes, puertas, ventanas, efectos eléctricos, materiales de plomería y otros. Si bien los alquileres que la oferta y demanda habían fijado en 1942 o el 12% del costo de construcción, según fuera el caso, pudieron ser razonables para hace treinta años, es dudoso que las guías de la ley sean adecuadas a la luz de las presentes realidades económicas.

Por ejemplo, nuestra Ley de Alquileres Razonables habla de "la emergencia" y se refiere a la de la Segunda Guerra Mundial. Su Art. 3 dice literalmente así:

"A los fines de proveer un régimen de alquileres razonables durante la emergencia, por la presente se estabilizan los alquileres al nivel que prevalecía el primero de octubre de 1942."—17 L.P.R.A. sec. 183.

Su Art. 1 contiene unos datos económicos, pero éstos corresponden al año 1940. Habla de la "gran demanda de edificios," y de la "especulación" y "agiotaje" por parte de sus

dueños. ¿Es ésa la realidad hoy día? La situación sobre la oferta y la demanda de viviendas en el mercado local parece haber variado considerablemente desde la emergencia de los años cuarenta. Según un estudio reciente, del 1971 al 1974 se construyeron 76,489 unidades de viviendas privadas y el año pasado (1974) había 18,355 unidades de viviendas privadas disponibles y no vendidas ni alquiladas. (6)

Los que residen en el área metropolitana, donde vive aproximadamente un tercio de la población de Puerto Rico, son testigos de los muchos apartamentos terminados y no vendidos ni alquilados que hay disponibles en dicha zona y de los muchos edificios de condominios que hay comenzados y cuya construcción se ha paralizado por falta de demanda de pisos. ¿No parece necesario revisar el concepto de "emergencia" de hace 33 años que contiene la ley? ¿Son las guías de la ley adecuadas y razonables hoy día? ¿Un canon de $145 mensuales, fijado en el año 1958, para una residencia sita en un sector residencial, cuya residencia se alquila de hecho en el año 1961 por $250 mensuales por casi once años consecutivos —lo que demuestra su valor en el mercado— no resulta dicho canon, en una privación ilegal de la propiedad?

■■■ En el caso de autos, los alquileres pagados en exceso en los años 1960 al 1964 no podían ser objeto de reembolso en el año 1972 por haber prescrito, a tenor con el Art. 1866 del Código Civil. Sobre la situación desde el 19 de junio de 1964 en adelante, el Administrador carecía de jurisdicción en vista de la Ley Núm. 67 de esa fecha. Debido a las antes expresadas razones de necesidad y utilidad social y para que haya certidumbre en cuanto a los derechos de arrendadores y arrendatarios, el término prescriptivo de cinco años antes mencionado se aplica tanto si el arrendatario hace su reclamación directamente mediante querella administrativa o por

---

(6) *Resumen del Estudio del Mercado de Viviendas en Puerto Rico* (1974) hecho por la Management Aid Center, Inc., para la Asociación de Constructores de Hogares de P.R., pág. 10.

la vía judicial, como si se hace indirectamente vía una orden del Administrador.

*Se confirmará la sentencia recurrida.*

El Juez Asociado Señor Rigau se inhibió. El Juez Asociado, Señor Martín no intervino. El Juez Asociado, Señor Negrón García emitió opinión concurrente y disidente.

—O—

Opinión concurrente y disidente del Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 16 de octubre de 1975

Concurro plenamente con la decisión del Tribunal que en balance justo y equitativo fundado en el silencio de la Ley de Alquileres Razonables, resuelve que el término prescriptivo de cinco (5) años dispuesto en el Art. 1866 del Código Civil (31 L.P.R.A. sec. 5296), como norma supletoria rige las acciones administrativas o judiciales incoadas por un arrendatario contra su arrendador en orden a cánones pagados en exceso.

Disiento no obstante de la conclusión de que la Administración de Servicios al Consumidor carece de jurisdicción para controlar los cánones envueltos cuando la renta mensual pactada por las partes es $200.00 o más en casos de vivienda, reiterando el Tribunal la norma expuesta en los casos de *Vda. de Hernández* v. *Pérez Colón, Admor.*, 94 D.P.R. 807 (1967); *Blanco Rojo* v. *A.E.E.*, 96 D.P.R. 231 (1968); *B. Fortaleza Corp.* v. *Bouzá*, 101 D.P.R. 270 (1973). Tal enfoque parte de la premisa errónea que la Ley Núm. 67, de 19 de junio de 1964 (17 L.P.R.A. sec. 184(b)), opera de pleno derecho, esto es, que pactado por las partes un canon de o en exceso de $200.00 la Administración carece de facultad para investigar si la renta acordada responde al valor real de la propiedad y por ende determinar si es controlable o no. La aplicación *ex*

*propio vigore* en tales casos se limita a las propiedades inscritas cuyo canon autorizado trasciende las cantidades indicadas, y no a los cánones fijados por el arbitrio de las partes contratantes.

La reafirmación de esta doctrina unida a las interrogantes constitucionales que la opinión plantea en cuanto a la validez de algunos de los criterios obsoletos que la ley contiene, hiere de muerte la intervención legítima del Estado en el control de rentas retrotrayendo en varias décadas legislación de vanguardia social de protección al consumidor en uno de los renglones de la vida más necesarios: la vivienda y la razonabilidad de su costo. "Es[t]a reglamentación forma parte ya de un cuerpo de derecho social encaminado a la protección del inquilino, parte jurídicamente más débil, y trasciende meros estados transitorios de emergencia." *Martínez* v. *Llavat*, 86 D.P.R. 235, 249 (1962).