RAMÓN A. SANTINI RIVERA y OTROS, demandantes y recurrentes, *v.* SERV AIR, INC. y OTROS, demandados y recurridos.

*Número:* RE-93-232        *Resuelto:* 12 de septiembre de 1994

*Efraín Latoni R.*, abogado de los recurrentes; *Mari Carmen Bosch*, abogada de los recurridos.

El Juez Asociado Señor Fuster Berlingeri emitió la opinión del Tribunal.

Nos toca resolver si los parientes de una persona que obligada a renunciar a su empleo por su patrono, mediante

actos de hostigamiento y discrimen por razón de origen nacional, tienen derecho a una causa de acción propia bajo el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, para indemnizar los daños que ellos experimentaron a consecuencia del trato discriminatorio que sufrió su pariente en el empleo.

## I

Los padres y la novia de Ramón Santini comparecieron como codemandantes en el pleito que éste instó contra su patrono Serv Air, Inc. En síntesis, estos codemandantes reclamaron el resarcimiento de los daños y perjuicios experimentados por ellos mismos como consecuencia del discrimen en el empleo sufrido por Santini, discrimen que alegadamente le llevó a verse en la obligación de renunciar a su trabajo.(1) La parte demandada presentó una moción de desestimación parcial, en la cual alegó que la concesión de daños por discrimen en el empleo es un remedio exclusivo para el empleado, que no está disponible para sus familiares.

Luego de los trámites procesales de rigor, el foro de instancia emitió una sentencia parcial que desestimaba la reclamación de la novia y de los padres de Santini. Como cuestión de derecho, el foro de instancia concluyó, en esencia, que la Ley Núm. 100 de 30 de junio de 1959 (29 L.P.R.A. sec. 146 *et seq.*) sólo tiene como propósito vindicar el discrimen del cual sea objeto el empleado y no provee ningún remedio para sus familiares. También concluyó que no procedía causa de acción alguna en favor de los parientes del empleado al amparo del Art. 1802 del Código Civil,

---

(1) Santini alegó en su demanda que por razón de su origen nacional el querellado le denegó plazas; le suspendió los entrenamientos dirigidos a convertirlo en mecánico especializado y entrenó, en su lugar, a personas con menor antigüedad. Además, alegó que sufrió una campaña de acosamiento, persecusión, discrimen y hostigamiento. Dicho patrón de conducta afectó su estado de ánimo y salud física a tal grado que le provocó angustias mentales que lo forzaron a renunciar.

*supra*, por ser la Ley Núm. 100, *supra*, la única medida que rige en los casos de discrimen.

De dicha sentencia acudieron ante nos la novia y los padres de Santini. Plantearon, en lo pertinente, los señalamientos de error siguientes:

> B. Erró el Honorable Tribunal de instancia al determinar que las reclamaciones de la parte recurrente se basaban, y sólo se podían basar, exclusivamente, en la Ley Núm. 100 del 30 de junio de 1959;
> C. Erró el Honorable Tribunal de instancia al determinar que la parte recurrente carecía de causa de acción bajo el Art. 1802 del Código Civil de Puerto Rico, ed.1930.

El 18 de junio de 1993, mediante resolución, decidimos revisar la sentencia objeto de este recurso.

## II

La ley Núm. 100, según enmendada, *supra*, prohíbe de modo general y penaliza el discrimen en el empleo. En la Exposición de Motivos de dicha ley se señala que su propósito es proteger a los trabajadores y aspirantes a empleo contra el discrimen en la relación de empleo. 1959 Leyes de Puerto Rico 300. "El historial legislativo de la Ley Núm. 100, ante, revela que su objetivo principal es proteger a los empleados de la empresa privada contra todo tipo de discrimen aun cuando, por excepción, se extiende la protección a los empleados de las agencias o instrumentalidades del gobierno que operan como negocios o empresas privadas." (Énfasis suprimido.) *Rodríguez Cruz v. Padilla Ayala*, 125 D.P.R. 486, 508 (1990). El propósito de la ley fue dotar a la clase obrera de los instrumentos necesarios para protegerla del discrimen por razón de edad, raza, color, sexo, origen social o nacional, condición social, e ideas políticas o religiosas. *García Pagán v. Shiley Caribbean, etc.*, 122 D.P.R. 193 (1988); *Cardona v. Depto. Recreación y Deportes*, 129 D.P.R. 557 (1991). Las enmiendas posteriores a

la Ley Núm. 100, *supra*, reafirman el objetivo fundamental legislativo de proveer protección contra el discrimen a los trabajadores y aspirantes a empleo específicamente.[2] No cabe duda alguna de que dicha ley carece de referencias a los *parientes* de los obreros protegidos.

La ausencia de esa referencia en la Ley Núm. 100, *supra*, sobre los parientes de los trabajadores se explica precisamente por la naturaleza y los propósitos de esta ley. La legislación en cuestión es *exclusivamente* de índole *laboral*. Su objeto estricto es la relación obrero-patronal. Está dirigida a tratar únicamente los derechos de los empleados y ofrecer particular protección a sus intereses. *No tiene, pues, nada que ver con terceros u otras personas que no sean empleados.* Precisamente porque tal es su ámbito y esencia, no tiene sentido alguno intentar la dilucidación de la situación jurídica de los parientes de los obreros, en el contexto de la citada Ley Núm. 100. Como no les aplica, no puede ser fuente de derechos para los parientes. Los derechos de los parientes de los obreros no son un apéndice del contrato laboral ni emanan supletoriamente o de modo alguno de la referida legislación especial, por lo que no procede acudir a ella para decidir si los parientes de los obreros tienen determinados derechos o no.[3] Los derechos de

---

[2] Ley Núm. 50 de 30 de mayo de 1972 (29 L.P.R.A. secs. 146–147); Ley Núm. 58 de 22 de junio de 1975 (29 L.P.R.A. secs. 146–146a, 147a, 148a y 150–150a); Ley Núm. 37 de 7 de junio de 1977 (29 L.P.R.A. secs. 146–147 y 151); Ley Núm. 67 de 3 de junio de 1983 (29 L.P.R.A. secs. 146–147 y 151); Ley Núm. 10 de 31 de mayo de 1991 (29 L.P.R.A. secs. 146 y 150), y la Ley Núm. 116 de 20 de diciembre de 1991 (29 L.P.R.A. secs. 146–147a).

[3] Las numerosas y variadas leyes especiales del país, relativas a los trabajadores, van dirigidas a ofrecer una *particular protección* a los intereses de *éstos*. Sobre todo porque, cuando se toman en conjunto, reflejan una política pública fundamental que dota al trabajador de garantías eficaces en favor de sus intereses. Se trata de legislación que persigue *superar* las salvaguardas generales y el amparo común que ofrece la legislación civil y penal ordinaria a esos trabajadores. Son, pues, fuente de derechos de mayor rango que suplantan, en cuanto a ellos se refiere, a los que surgen de la legislación ordinaria. *No pueden ser, de modo alguno, fuentes de limitación de derechos de otros no comprendidos en dicha legislación.*

Esta legislación social, en pro del trabajador, refleja el sitial especial que se le reconoce en las democracias modernas. Responde a una concepción de la dignidad de la persona que le atribuye preeminencia particular al derecho de cada ser humano a

los parientes, en casos como el de marras, constituyen una normativa independiente que surge por su propia cuenta al amparo del Art. 1802 del Código Civil, *supra,* conforme a los principios generales de la responsabilidad extracontractual. Es a esos principios y a ese artículo, a los cuales hay que acudir como fuentes de derecho, cuando se dilucida la situación jurídica del pariente del obrero.

## III

▮▮ Conforme a los conocidos principios de responsabilidad civil extracontractual, es un dato fundamental, no sujeto a rectificación judicial alguna, que "todo perjuicio, material o moral, da lugar a reparación si concurren *tres* requisitos o elementos: primero, se establece la realidad del daño sufrido; segundo, existe un nexo causal entre el daño y la acción u omisión de otra persona; y tercero, dicho acto u omisión es culposo o negligente. 4 Castán, Derecho Civil Español, (8a. ed., 1956) 814 y sigtes.; Puig Peña, Tratado de Derecho Civil Español, tomo IV, vol. 2 (1951) 537 y sigtes.; 2 Díaz Pairó, Teoría General de las Obligaciones, (3a. ed., 1954) 51 y sigtes.; Borrell, Responsabilidades Derivadas de la Culpa Extracontractual Civil, (1942) 60–76, 157–177". (Énfasis suprimido.) *Hernández v. Fournier,* 80 D.P.R. 93, 96 (1957). Véanse, además: J. Puig Brutau, *Fun-*

---

ganarse el sustento con un trabajo seguro y decoroso y que no acepta ya, de modo alguno, las conocidas iniquidades derivadas del *laissez-faire* decimonómico. Dicha legislación social, además, está en esencial conformidad con la visión contemporánea prevaleciente del trabajo, no sólo como un *bonum arduum* mediante el cual la persona humana se realiza a sí misma, se forma la vida familiar y se construye la comunidad social, sino también como la causa primaria eficiente del proceso mismo de producción, que tiene *prioridad* sobre cualquier otro elemento de éste.

Propiamente concebida, pues, la legislación social de índole laboral no puede ser fuente de limitaciones a los derechos generales que surgen del Código Civil. Los esquemas de ley, derogatorios de las normas generales sobre responsabilidad civil que imperan en nuestro país, no pueden inferirse de forma liviana. Es la Asamblea Legislativa la que debe limitar los remedios disponibles. Cuando el legislador ha querido crear inmunidades y exclusividad de remedios, así lo ha hecho expresamente, como en el caso del Art. 20 de la Ley de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. sec. 21. *García Pagán v. Shiley Caribbean, etc.,* 122 D.P.R. 193 (1988).

*damentos de Derecho Civil*, 1ra ed., Barcelona, Ed. Bosch, 1983, T. II, Vol. III, pág. 80 *et seq.*; M. Albaladejo, *Derecho Civil*, Barcelona, Ed. Bosch, T. II, Vol. II, pág. 511 *et seq.*; H.M. Brau, *Los Daños y Perjuicios Extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. 1, Cap. II, pág. 58; J.M. Cuevas Segarra, *La responsabilidad civil y el daño extracontractual en Puerto Rico*, 1ra ed., San Juan, Pubs. J.T.S., 1993, pág. 82. Véanse, también: *Orozco v. E.L.A.*, 80 D.P.R. 607 (1958); *Torres Ocasio v. Autoridad sobre Hogares*, 93 D.P.R. 452, 455 esc. 2 (1966); *Rodríguez v. Colón Colón*, 103 D.P.R. 493 (1975); *Torres Maldonado v. J.C. Penney Co.*, 130 D.P.R. 546 (1992); *Soc. de Gananciales v. El Vocero de P.R.*, 135 D.P.R. 122 (1994).

En cuanto a los daños, hemos señalado que " '[d]año' es todo aquel menoscabo material o moral que sufre una persona, ya en sus bienes vitales naturales, ya en su propiedad o en su patrimonio, causado en contravención a una norma jurídica y por el cual ha de responder otra". *García Pagán v. Shiley Caribbean, etc.*, supra, págs. 205–206. Véanse: J. Santos Briz, *La responsabilidad civil: derecho sustantivo y derecho procesal*, 2da ed. rev., Madrid, Ed. Montecorvo, 1977, pág. 126; M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Edersa, 1984, T. XXIV, pág. 156; Brau, *op. cit.*, Vol. 1, Cap. VIII, pág. 427. Si bien en principio los daños intangibles, como lo son el sufrimiento, las angustias mentales y los daños emocionales, se consideran daños no patrimoniales, debido a que su valoración pecuniaria no se funda en una equivalencia matemática, no por eso dejan de ser compensables en dinero. Santos Briz, *op. cit.*, págs. 140–169; Brau, *op. cit.*, pág. 427; G. Ortiz Ricol, *Valoración jurídica del daño moral*, III (Núm. 11) Rev. Der. Esp. y Amer. 141 (1958). Después de todo, los daños morales pueden ser de tal magnitud que su importancia exceda a la de cualquier daño material sufrido.

En cuanto al acto culposo, el concepto que preva-

lece en nuestra jurisdicción es abarcadoramente amplio. En *Hernández v. Fournier*, supra, págs. 96–97, al interpretar y aplicar el Art. 1802 del Código Civil, *supra*, señalamos que éste "establece uno de los principios más fundamentales de nuestro orden jurídico, ... *que no admite limitación ni excepción de clase alguna*". (Énfasis suplido.) Desde hace mucho tiempo, hemos reconocido en nuestra jurisprudencia el concepto de daño culposo o negligente como una fuente de obligaciones *de gran alcance*. Con ello hemos incorporado a nuestro ordenamiento jurídico una norma reconocida del Derecho moderno, que tanto en el Derecho Civil como en el anglosajón se concibe de manera abarcadora, con amplitud de criterio. F. Puig Peña, *Nueva Enciclopedia Jurídica*, Tomo VI, 1954, pág. 108. Así, pues, en *Reyes v. Sucn. Sánchez Soto*, 98 D.P.R. 305, 310 (1970), reconocimos que el concepto de culpa del Art. 1802 del Código Civil de Puerto Rico, *supra*, "es infinitamente abarcador, tan amplio y abarcador como suele ser la conducta humana". Señalamos allí, además, que:

> Hay un deber social que nos llega desde los más antiguos Derechos que impone el abstenerse de causar daño o perjudicar a un semejante, el *"alterum non laedere"* del Derecho Romano que como dice Black, ... junto al *"honeste vivere"* eran considerados por Justiniano como principios fundamentales sobre los cuales se basan todas las reglas de ley. *Reyes v. Sucn. Sánchez Soto*, supra, pág. 312.

También afirmamos en esa ocasión que "[e]l concepto de culpa incluye todo tipo de transgresión humana tanto en el orden legal como en el orden moral". *Reyes v. Sucn. Sánchez Soto*, supra, pág. 313.

En *Ramos v. Carlo*, 85 D.P.R. 353 (1962), citamos a Castán y a Barassi para definir la *transgresión jurídica* que acarrea la obligación de reparar los daños causados por ésta. Dijimos allí que

> ... la necesidad de una convivencia social ordenada impone un deber general de corrección y de prudencia en relación con los

demás ciudadanos, y el acto es ilícito en el sentido extracontractual cuando viola los deberes generales de corrección social o de conducta correcta, *deberes que no están escritos en los códigos pero que representan el presupuesto mínimo sobreentendido del orden de la vida social.* (Énfasis suplido.) *Ramos v. Carlo,* supra, pág. 359.

En *Colón v. Romero Barceló,* 112 D.P.R. 573, 579 (1982), reiteramos nuestros pronunciamientos antes citados y volvimos a recalcar que el concepto de culpa del derecho de daños es tan infinitamente amplio que "incluye cualquier falta de una persona que produce un mal o daño". En *Gierbolini v. Employers Fire Ins. Co.,* 104 D.P.R. 853, 860 (1976), señalamos que "[l]a culpa tiene ... naturaleza proteiforme; cambia como cambia el parecer de los hombres según las circunstancias de lugar y tiempo". Señalamos, además, que "[e]sta flexibilidad del concepto de la culpa es deseable; de otro modo se anquilosaría el derecho de la responsabilidad extracontractual". Íd., pág. 860.

Esta plasticidad del concepto del acto culposo es bien reconocida por la doctrina civilista. Como acertadamente señala Santos Briz, se trata de una noción que "oscila entre un concepto amplio que la identifica con lo ilícito a un concepto estricto que la limita a lo que es contrario a la ley positiva". Santos Briz, *op. cit.,* 3ra ed., 1981, pág. 26. Citando a Gschnitzer, Santos Briz abunda en lo anterior al señalar que la acción culposa presupone la infracción de alguna norma "ya de la ley, ya del contrato ... o ya lesione principios jurídicos superiores" incluyendo "el atentado a las buenas costumbres". Íd.

Puig Brutau, *op. cit.,* pág. 81, también expresa una visión similar. Nos señala el eminente jurista civilista que:

En principio, todo hecho que cause daño y que no esté específicamente justificado o permitido ha de considerarse prohibido y contrario a Derecho. La primera y más elocuente manifestación de la ilicitud es el mismo daño producido, sin perjuicio de que pueda demostrarse que se trata de un caso fortuito o que ha sobrevivido por fuerza mayor. Si se trata de una conducta expresamente prohibida por una disposición legal la cuestión no

es dudosa; pero tampoco lo ha de ser si la norma infligida es el principio que prohíbe causar daño a otro (*neminem laedere*). (Escolio omitido.)

## IV

De acuerdo con los principios anteriores, la indemnización a una persona por sus propios sufrimientos, provocados por los daños experimentados por un pariente, que de ordinario conceden los tribunales en las más diversas circunstancias, dimana del principio general del derecho de daños, que reiteramos con cabal fundamentación en *Hernández v. Fournier*, supra. Allí señalamos que son compensables no sólo los daños que sufre la víctima o el perjudicado directamente por un acto culposo o negligente, sino también los daños morales sufridos por "las personas vinculadas por lazos de parentesco, afecto y cariño" con la víctima o perjudicado. Íd., pág. 97. Explicamos con gran autoridad en *Hernández v. Fournier*, supra, que el perjuicio material y moral que causa un acto culposo o negligente "puede refluir *sobre varias personas*. Y en tal caso, cada una de éstas adquiere una *acción independiente* contra el causante ... pues la fuente de la responsabilidad es precisamente el perjuicio particular y personal sufrido por cada uno" de ellos. Íd., págs. 97–98.

En numerosas ocasiones hemos reconocido que una persona tiene derecho a una indemnización por los sufrimientos, los trastornos morales o las angustias mentales que haya experimentado a consecuencia de los daños materiales o de otra índole que, a su vez, le hayan causado de forma directa a sus parientes. Hemos reconocido el derecho de una persona a recibir una compensación cuando su cónyuge u otro pariente sufra daños *en las situaciones más diversas*, como son, por ejemplo, *insultos y discrimen racial, Muriel v. Suazo*, 72 D.P.R. 370 (1951); *muerte ilegal, Vda. de Valentín v. E.L.A.*, 84 D.P.R. 112 (1961); *Travieso v.*

*Del Toro y Travieso, Int.*, 74 D.P.R. 1009 (1953); *persecución maliciosa, Berríos v. International General Electric*, 88 D.P.R. 109 (1963); *explosión negligente de líneas eléctricas, Concepción Guzmán v. A.F.F.*, 92 D.P.R. 488 (1965); *Cirino v. Fuentes Fluviales*, 91 D.P.R. 608 (1964); *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443 (1985); *accidentes laborales, Vda. de Delgado v. Boston Ins. Co.*, 99 D.P.R. 714 (1971); *rechazo equivocado de tarjeta de crédito, Santiago v. Sears Roebuck*, 102 D.P.R. 515 (1974); *accidentes automovilísticos, Ferrer v. Lebrón García*, 103 D.P.R. 600 (1975); *impericia médica, Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721 (1984); *difamación, Soc. de Gananciales v. El Vocero de P.R.*, supra, y *profanación de tumba, Maldonado v. Municipio de Ponce*, 39 D.P.R. 247 (1929).

## V

Resulta evidente, al aplicar la normativa antes señalada al caso ante nos, que de ser ciertas las alegaciones de todos los demandantes se configuraría en favor de los parientes de Santini una causa de acción bajo el Art. 1802 del Código Civil de Puerto Rico, *supra*. Están claramente presentes los tres requisitos esenciales de tal acción. Los parientes en cuestión alegan que: (1) han sufrido un daño moral compensable; (2) el daño fue causado por el trato discriminatorio que el patrono le dió a su empleado Santini, con quien los referidos demandantes están vinculados por lazos de parentesco, afecto y cariño de modo tal que el impacto del trato discriminatorio sobre Santini refluye sobre ellos y les causa perjuicio, y (3) el acto del patrono fue culposo, conforme al concepto abarcadoramente amplio que sobre el particular prevalece en nuestra jurisdicción.

Es menester resaltar que, a pesar de que reiteramos aquí la continuada vigencia en nuestra jurisdicción del amplísimo concepto del acto culposo, el cual incluye "todo tipo de transgresión humana tanto en el orden legal

como en el orden moral", *Reyes v. Sucn. Sánchez Soto*, supra, pág. 313, e incluye además "cualquier falta de una persona que produce un mal o daño", *Colón v. Romero Barceló*, supra, pág. 579, en el caso de marras no es necesario acudir a ese concepto dilatado y abarcador de culpa que tratadistas del renombre de Santos Briz y Puig Brutau han constatado y que nuestra jurisprudencia ha adoptado. Ello no es necesario aquí, porque en el caso ante nos, de ser ciertas las alegaciones de los demandantes, tratamos con una conducta claramente ilegal que, además, es violatoria de una clara política pública de rango constitucional. La alegada conducta del patrono constituye un trato discriminatorio proscrito por la Ley Núm. 100, *supra*, el cual impone severas sanciones, tanto civiles como penales, a quienes violen sus preceptos.

El claro tenor antijurídico de la alegada acción del patrono no surge únicamente de la Ley Núm. 100, *supra*. En Puerto Rico, como es conocido, existe una vigorosa política pública dirigida a erradicar todo tipo de discrimen de nuestra sociedad. Dicha política pública tiene su origen en nuestra Constitución.

La Carta de Derechos, Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 257, establece:

> La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana.

En su informe a la Convención Constituyente, la Comisión de la Carta de Derechos señaló:

> El propósito de esta sección es fijar claramente como base consustancial de todo lo que sigue el principio de la dignidad del ser humano y, como consecuencia de ésta, la igualdad esencial de todas las personas dentro de nuestro sistema constitucional. La igualdad ante la ley queda por encima de accidentes o diferencias, bien tengan su origen en naturaleza o

en la cultura. *Todo discrimen o privilegio contrario a esta esencial igualdad repugna al sistema jurídico puertorriqueño.* En cuanto fuera menester nuestra organización legal queda robustecida por la presente disposición constitucional, a la vez que obliga a ensanchar sus disposiciones para dar plena realización a lo aquí dispuesto. 4 Diario de Sesiones de la Convención Constituyente 2561 (1951).

■ Aunque la Asamblea Constituyente no concibió el discrimen por razón de nacionalidad como uno de los que expresamente prohíbe el Art. II, Sec. 1 de la Constitución del E.L.A., *supra*, en *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518 (1972), nosotros jurisprudencialmente añadimos el discrimen por nacionalidad al catálogo de la Sec. 1, en evidente reconocimiento de que dicha disposición no constituye una enumeración taxativa de las instancias que configuran el discrimen. *De Paz Lisk v. Aponte Roque*, 124 D.P.R. 472 (1989).

■ De lo anterior surge, pues, que en Puerto Rico existe una clara política pública, de origen tanto constitucional[4] como estatutario, que prohíbe el discrimen por razón de nacionalidad. En su vertiente legislativa, esa política pública fundamental incluye expresamente la veda del trato discriminatorio de empleados por razón de origen nacional e incluye penalidades severas que han de imponerse a los patronos que incurran en la conducta prohibida. En vista de ello, es evidente que en el caso ante nos la actuación del patrono demandado, de ser ciertas las alegaciones de Santini, constituyó una violación de esta política pública y, como tal, constituye un acto culposo —aun bajo la más tradicional y conservadora de las concepciones del acto culposo— y ciertamente, bajo los claros y contundentes pronunciamientos previos de este Tribunal, que precep-

---

[4] El mandato constitucional que prohíbe el discrimen por razón de nacionalidad constituye como tal una limitación sólo al ejercicio de los poderes del Estado, conforme al conocido principio de "acción del Estado" (*state action*). Sin embargo, en términos axiológicos, esa limitación no disminuye el hecho de que en nuestro sistema jurídico la prohibición del discrimen constituye un valor jurídico de la más alta jerarquía.

túan la indemnización de un daño cuando "ha habido una violación de un derecho que se concede o la omisión de un deber impuesto por ley".[5] *Ocasio Juarbe v. Eastern Airlines, Inc.*, 125 D.P.R. 410, 418 (1990).

## VI

Por los fundamentos antes expresados, resolvemos que en Puerto Rico los parientes de un empleado que haya sido víctima de trato discriminatorio por su patrono bajo la Ley Núm. 100, *supra*, tienen una causa de acción propia al amparo del Art. 1802 del Código Civil, *supra*, para obtener una indemnización por los daños que ellos mismos hayan sufrido a consecuencia del referido discrimen laboral. En tales circunstancias, se compensarán lós daños propios sufridos por los parientes, una vez quede establecido el trato discriminatorio en cuestión.

*Se dictará sentencia para revocar la del tribunal de instancia en este caso y se devolverá a dicho foro para que continúen los procedimientos conforme con lo aquí resuelto.*

El Juez Asociado Señor Rebollo López concurrió sin opinión escrita. El Juez Asociado Señor Hernández Denton emitió una opinión de conformidad. La Juez Asociada Señora Naveira de Rodón emitió una opinión concurrente en parte y disidente en parte.

---

[5] Como hemos señalado, el legislador, mediante la Ley Núm. 100 de 30 de junio de 1959 (29 L.P.R.A. sec. 146 *et seq.*), estableció severas sanciones civiles y penales con el evidente propósito de disuadir a los patronos de incurrir en conducta discriminatoria. Por ello, el reconocimiento del derecho de los parientes del empleado discriminado a incoar su propia causa de acción, que aquí hacemos, habrá de contribuir al logro de la intención legislativa plasmada en la Ley Núm. 100, *supra*. Aparte del derecho que tienen dichos parientes al amparo del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, esta causa de acción constituye un aliciente adicional para que los patronos eviten incurrir en el tipo de conducta discriminatoria que está prohibida por dicha ley.

— O —

Opinión de conformidad del Juez Asociado Señor Hernández Denton.

En vista de la vigorosa política pública, reflejada por nuestra legislación, que prohíbe el discrimen por razón de nacionalidad, es forzoso concluir que aquellas personas unidas por vínculos cercanos al empleado que haya sido objeto del discrimen tienen derecho a reclamar los daños que sufran a consecuencia de la conducta discriminatoria del patrono.

Ciertos tipos de discrimen, por parte del patrono contra un empleado, son condenados con severidad por nuestra legislación laboral. En general, este discrimen tiene consecuencias directas sobre las personas allegadas al empleado, en particular sobre su círculo familiar. De ordinario, un despido motivado por discrimen provoca hondas angustias y pesares no sólo al empleado, sino a su familia; ello debido no sólo a las consecuencias patrimoniales de encontrarse desempleado, con los obvios efectos de esta situación sobre los miembros del núcleo familiar, sino a las consecuencias psicológicas y sociales que resultan de un despido injusto e injustificado. Naturalmente, estas repercusiones serán sufridas por aquellas personas unidas con el empleado por lazos estrechos de afecto o parentesco y, en la medida como sufran los daños, el patrono que los causó deberá indemnizarlos.

Sin duda, este curso decisorio contribuirá sustancialmente al logro de los fines y propósitos de la legislación social en esta área. Es evidente el propósito preventivo y punitivo de nuestro ordenamiento al concederle al empleado, que sea objeto de conducta discriminatoria, el doble de los daños que en verdad haya sufrido. Acorde con el objetivo de nuestra legislación de alentar a los patronos para que no incurran en este tipo de conducta y, de lo con-

trario, castigarlos severamente, estamos conformes con la conclusión de la opinión del Tribunal en cuanto a que aquellos que hayan sufrido un daño como consecuencia de discrimen, tendrán derecho a ser indemnizados por el patrono al amparo del Art. 1802 de nuestro Código Civil, 31 L.P.R.A. sec. 5141.

Por otro lado, estimamos procedente precisar nuestra posición en torno a los remedios disponibles al empleado despedido injustificadamente bajo la Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. sec. 185a *et seq.*). Como regla general, ante una conducta de un patrono, prevista y sancionada por una legislación especial de índole laboral, el empleado sólo tendrá derecho al remedio que dicha ley disponga, sin poder acudir al Art. 1802 del Código Civil, *supra*, en busca de compensación adicional. *Rivera v. Security Nat. Life Ins. Co.*, 106 D.P.R. 517, 527 (1977). En los casos de despidos que no infrinjan ninguna ley laboral y que solamente tengan el efecto jurídico de activar la indemnización provista por la Ley Núm. 80, *supra*, el único remedio que tendrá el obrero o trabajador consistirá en dicha indemnización. Bajo dicha disposición, el empleado no tiene derecho a un remedio adicional bajo el Art. 1802 del Código Civil, *supra*, ni tampoco lo tendrán los terceros, tales como sus familiares.

Le hemos reconocido solamente una excepción a la antedicha regla general. En *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35 (1986), resolvimos que si el despido que ordinariamente solamente da lugar a la mesada establecida por la Ley Núm. 80, *supra*, tiene el propósito o efecto de frustrar una clara política pública de rango constitucional, entonces el obrero puede, además, recobrar todos los daños sufridos, ello al amparo del Art. 1802 del Código Civil, *supra*.([1])

---

([1]) Aunque lo que resolvimos en *Rivera v. Security Nat. Life Ins. Co.*, 106 D.P.R. 517, 527 (1977), pueda parecer una excepción a la exclusividad de remedios bajo la Ley Núm. 80 de 30 de mayo de 1976 (9 L.P.R.A. sec. 185a *et seq.*), en realidad no lo es.

— O —

Opinión concurrente en parte y disidente en parte emitida por la Juez Asociada Señora Naveira de Rodón.

Disentimos de la opinión del Tribunal por considerar que el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, no cobija la reclamación por sufrimientos y angustias mentales de la novia y los padres de un obrero que alega haber sido objeto de discrimen por razón de origen nacional en violación a la Ley Núm. 100 de 30 de junio de 1959 (29 L.P.R.A. sec. 146 *et seq.*). Concurrimos en aquella parte en que se concluye que la Ley Núm. 100, *supra*, sólo aplica a empleados o solicitantes de empleo.

## I

El Sr. Ramón A. Santini Rivera trabajó como *airchaft worker* para Serv Air, Inc. desde el 24 de septiembre de 1990 hasta el 29 de agosto de 1991. En esta última fecha renunció.

El 26 de agosto de 1992, el señor Santini Rivera, junto a sus padres, el Sr. Eladio Santini Rivera y la Sra. Daniela Rivera de Santini, la sociedad legal de gananciales compuesta por éstos, y su novia, la Srta. Nora T. Negrón Rivera, presentaron una demanda contra Serv Air, Inc., el Sr. Bradford Marks, supervisor de operaciones de Serv Air, Inc., el Sr. Richard Hamment, supervisor de control de calidad, y el Sr. Ira Bailey, supervisor de la unidad de servicio.[1] El obrero alegó que debido a unas querellas que instó contra Serv Air, Inc. en el Departamento del Trabajo y Recursos Humanos, por problemas en el pago de horas

---

Dicho caso únicamente establece que la exclusividad de remedios que ante un despido le imponga una ley laboral al empleado no impide que éste recobre bajo el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, por conducta distinta al despido que sin embargo sea culposa o negligente.

[1] Además, se incluyó como demandados de nombre desconocido a la Aseguradora X, John Doe y Richard Roe.

extras y por alegadas violaciones a las normas de seguridad en el empleo, la demandada Serv Air, Inc. comenzó una "campaña de acosamiento, persecución, discriminación y hostigamiento" en su contra. Además, señaló que por negarse a certificar falsamente la aptitud para volar de aeronaves a su cargo sus superiores le informaron "que por su actitud no había ni habría jamás supervisores puertorriqueños". Alegó que se le suspendió de entrenamientos conducentes a convertirse en un mecánico especializado y se le denegaron las plazas vacantes. En su lugar, alegadamente se consideró a una persona con menos antiguedad y experiencia.

Debido a esta alegada situación, el obrero Santini Rivera señaló que tuvo que renunciar a su empleo porque su salud física y estado de ánimo se vieron gravemente afectados. Como compensación, reclamó cuatrocientos cincuenta y ocho dólares con cincuenta y ocho centavos ($458.58) en pago de horas extra; diecinueve mil ciento cuatro dólares ($19,104) en concepto de lucro cesante por la pérdida de su empleo al ser obligado a renunciar discriminatoriamente y en violación a la Ley Núm. 100, *supra*; quince mil dólares ($15,000) por daños a su buen nombre, reputación y crédito; diez mil dólares ($10,000) por daños morales, sufrimientos y angustias mentales, y veintinueve mil setecientos setenta y dos dólares con treinta y un centavos ($29,772.31) por la pérdida de su automóvil al tener que entregarlo voluntariamente a la casa financiera por no tener dinero para pagar la deuda.

Sus padres, la sociedad de gananciales compuesta por éstos y su novia alegaron haber sufrido serias angustias mentales al percibir el estado depresivo del demandante.([2])

---

([2]) La reclamación por angustias mentales instada por la sociedad legal de gananciales de los padres del obrero es claramente inmeritoria y contraria a derecho. Véase *Robles Ostolaza v. U.P.R.*, 96 D.P.R. 583, 597 (1968).

Reclamaron treinta y cinco mil dólares ($35,000) en compensación.(3)

El 28 de octubre de 1992, Serv Air, Inc. presentó moción en solicitud de desestimación parcial.(4) Alegó que los codemandantes no tienen derecho a reclamar una compensación por las alegadas angustias mentales que les ocasionó el alegado discrimen. Señaló que la Ley Núm. 100, *supra*, sólo provee remedios para el empleado o aspirante a empleo. En vista de ello, solicitó la desestimación de las reclamaciones de los antedichos codemandantes.(5)

El 2 de diciembre de 1992 los codemandantes presentaron una oposición a la moción de desestimación parcial. En ésta alegaron que no reclamaban remedios por virtud de la Ley Núm. 100, *supra*, u otras leyes laborales, ni tampoco porque fuesen empleados de Serv Air, Inc., sino que el fundamento de su reclamación eran los Art. 1802–1803 del Código Civil, 31 L.P.R.A. secs. 5141 y 5142. En este sentido, expresaron que el Art. 1802 del Código Civil, *supra*, constituye una norma general para la reparación de todo daño ilícito, ya que el concepto de culpa, como la conducta de los seres humanos, incluye cualquier falta de una per-

---

(3) El 18 de marzo de 1993 los demandantes solicitaron un permiso para enmendar la demanda para especificar que la querella instada por el obrero demandante imputándole a Serv Air, Inc. alegadas violaciones a las normas de seguridad en el empleo se presentó primero en la Oficina de P.R.O.S.H.A. y luego en la oficina de Normas del Trabajo, ambas del Departamento del Trabajo y Recursos Humanos. La antedicha enmienda fue admitida por el tribunal de instancia el 1ro de abril de 1993. La demanda enmendada se presentó el 13 de mayo de 1993.

(4) En esta misma fecha presentó su Contestación a la demanda. El 18 de mayo de 1993 presentó la Contestación a la demanda enmendada.

(5) El codemandado Sr. Richard Hammett también presentó una moción de desestimación parcial el 28 de octubre de 1992. En ésta alegó que él no responde en su carácter personal por los daños que reclaman los demandantes. El 8 de diciembre de 1992 los demandantes presentaron su oposición a la moción de desestimación parcial. El 4 de enero de 1993 el codemandado Sr. Richard Hammett presentó una réplica. El tribunal de instancia celebró una vista el 15 de marzo de 1993 para discutir todas las mociones de desestimación parcial. El 25 de junio de 1993 éste dictó una sentencia parcial que desestimó la demanda contra el Sr. Richard Hammett. Los demandantes presentaron una moción de reconsideración. De los autos del caso no surge que ésta haya sido resuelta, por lo que se entiende fue denegada.

sona que produce un daño. *Colón v. Romero Barceló*, 112 D.P.R. 573, 579 (1982). Por lo tanto, sostienen que tienen derecho a ser compensados por los daños que le ocasionaron los alegados actos discriminatorios de Serv Air, Inc. contra el obrero demandante.

El 4 de enero de 1993 Serv Air, Inc. presentó una réplica en la que reiteró sus fundamentos para solicitar la desestimación parcial de la demanda. Además, señaló que el Art. 1802 del Código Civil, *supra*, no puede ser fuente de remedios para los codemandados porque la prohibición contra el discrimen en el empleo sólo surge de la Ley Núm. 100, *supra*. Según el demandado, ante la inaplicabilidad de dicha ley a los codemandantes, es errado el recurrir a la prohibición constitucional contra el discrimen, Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, para fundamentar una causa de acción en daños y perjuicios bajo el citado Art. 1802.[6]

---

[6] Sobre este particular, el demandado señaló:

"Es un principio cardinal del derecho constitucional que los derechos constitucionales (a excepción del derecho a la intimidad en Puerto Rico), se tienen frente al estado y no frente a ciudadanos particulares. La promulgación de la Ley 100 era esencial por no ser autoejecutable frente a ciudadanos particulares la prohibición de discrimen contenida en nuestra Constitución. La Ley 100 tuvo el efecto de extender la protección contra el discrimen al ámbito privado. Para extender tal protección al ámbito privado era clara la necesidad de legislación expresa y fue por esta razón que el legislador pasó lo que hoy conocemos como la Ley 100. Con anterioridad a ésto, el único remedio que tenía un obrero discriminado contra su patrono privado era la Ley 50, predecesora de la Ley 80. Por ende, en estricto rigor jurídico es necesario concluir que en ausencia de la promulgación de la Ley 100, ni el empleado o aspirante a empleo habría tenido remedio legal contra un patrono en casos de discrimen, más allá de las disposiciones de la Ley 80. De sostenerse la posición de la parte demandante tendríamos obligatoriamente que concluir también que tanto el obrero demandante como sus familiares tendrían derecho a reclamar bajo nuestra Constitución y el Artículo 1802 por alegado discrimen. Entonces, ¿cuál es el propósito de tener una legislación especial como la Ley 100? ¿Es que el obrero alegadamente discriminado tendría menos derechos que sus familiares y sólo puede reclamar bajo la Ley 100?

"Lo que pretende ahora la parte co-demandante es crear un remedio que no contempló el Legislador, haciendo uso de otras disposiciones de nuestro ordenamiento jurídico y aplicándolas a una situación obrero-patronal para un ente que no forma parte de esa relación. Es decir, se pretende conceder remedios a la novia del empleado, a los padres de éste y a la sociedad legal de gananciales compuesta por los padres de éste, ajenos todos a la relación obrero-patronal, a consecuencia de los mismos hechos que alegadamente justifican un remedio a nombre del obrero.

"Asimismo, es necesario enfatizar que el Artículo 1802 del Código Civil de Puerto Rico no opera en un vacío. En presencia de legislación específica es a esta

El 15 de marzo de 1993 el tribunal de instancia celebró una vista en la que las partes presentaron sus posiciones sobre la moción de desestimación parcial. Finalmente, el 22 de abril de 1993 emitió una sentencia parcial en la cual desestimó las reclamaciones de los codemandantes.

Señaló que el propósito de la Ley Núm. 100, *supra*, es vindicar, exclusivamente, al empleado o aspirante a empleo que ha sido objeto de actos discriminatorios por parte de su patrono. Por ello, dicha ley no provee remedios para los familiares del empleado. Sobre la existencia de una causa de acción por virtud del Art. 1802 del Código Civil, *supra*, señaló que la Ley Núm. 100, *supra*, lo desplaza por ser la legislación especial aplicable. Además, denegó la existencia de una causa de acción en daños y perjuicios fundamentada en la prohibición constitucional contra el discrimen, porque ésta sólo es eficaz contra el Estado y no contra ciudadanos particulares. Razón por la cual, señaló que fue necesaria la aprobación de la Ley Núm. 100, *supra*, a fin de prohibir el discrimen en el ámbito privado, y en este caso únicamente en la relación de empleo. En virtud de ello concluyó que resolver que los familiares del empleado u otras personas ajenas a la relación de empleo tienen derecho a obtener una compensación del patrono del obrero "crearía una anomalía jurídica de conceder un remedio a una parte amparado en una disposición constitucional en ausencia del requisito de razón de estado".

Los demandantes, inconformes con esta determinación, recurrieron ante nos mediante petición de revisión. Señalaron los errores siguientes:

---

legislación a donde debe acudirse para aclarar el contorno de los remedios legales concebibles para diferentes partes. La parte querellada respetuosamente señala que el lenguaje de la Ley 100 es claro y que no debe menospreciarse el mismo en aras de llegar a un resultado forzado y ajeno al·balance de intereses que llevó a cabo el legislador. De entender el Honorable Tribunal que existe una laguna en este aspecto, la resolución de la misma debe referirse al Legislador, quien al promulgar estas leyes ha sopesado un delicado balance de intereses. Resolver lo contrario crearía la anomalía jurídica de conceder un remedio a una parte amparado en una disposición constitucional en ausencia del requisito de razón de estado ("state action")."

A. Erró el Honorable Tribunal de Instancia al determinar que la parte recurrente carecía de causa de acción para instar reclamación alguna y que por lo tanto procedía la desestimación;

B. Erró el Honorable Tribunal de Instancia al determinar que las reclamaciones de la parte recurrente se basaban, y solo se podían basar, exclusivamente, en la Ley Núm. 100 del 30 de junio de 1959;

C. Erró el Honorable Tribunal de Instancia al determinar que la parte recurrente carecía de causa de acción bajo el Art. 1802 del Código Civil de Puerto Rico, ed. 1930;

D. Erró el Honorable Tribunal de Instancia al utilizar jurisprudencia interpretativa de estatutos federales análogas [sic] para desestimar la causa de acción de los aquí recurrentes sin tomar en cuenta que dicha jurisprudencia e interpretaciones van en contra de los elementos más básicos de nuestro derecho civil.

## II

La Ley Núm. 100, *supra*, establece una prohibición contra el discrimen en el empleo.[7] Examinemos, pues, si ésta

---

[7] La Ley Núm. 100 de 30 de junio de 1959 (29 L.P.R.A. sec. 146 *et seq.*), en su parte pertinente, dispone:

"Todo patrono que despida, suspenda o discrimine contra un empleado suyo en relación a su sueldo, salario, jornal o compensación, términos, categorías, condiciones o privilegios de su trabajo, o que deje de emplear o rehúse emplear o reemplear a una persona, o limite o clasifique sus empleados en cualquier forma que tienda a privar a una persona de oportunidades de empleo o que afecten su *status* como empleado, *por razón de edad*, según ésta se define más adelante, raza, color, sexo, origen social o nacional, condición social, ideas políticas o religiosas del empleado o solicitante de empleo:

"(a) *Incurrirá en responsabilidad civil*

"(1) *por una suma igual al doble del importe de los daños que el acto haya causado al empleado o solicitante de empleo*;

"(2) o por una suma no menor de cien (100) dólares ni mayor de mil (1,000) dólares, a discreción del tribunal, si no se pudieren determinar daños pecuniarios;

"(3) o el doble de la cantidad de los daños ocasionados si ésta fuere inferior a la suma de cien (100) dólares; y[sic]

"(b) incurrirá, además, en un delito menos grave y, convicto que fuere, será castigado con multa no menor de cien (100) dólares ni mayor de quinientos (500) dólares, o cárcel por un término no menor de treinta (30) días ni mayor de noventa (90) días, o ambas penas, a discreción del tribunal.

"De igual modo, constituirá una práctica discriminatoria e incurrirá en la responsabilidad civil y penal antes expuesta, todo patrono que cometa cualquiera de los actos que se señalan en el primer párrafo de esta sección por razón de tratarse de una persona casada con un empleado o empleada de su empresa o negocio. Esta

acoge la reclamación de los codemandantes, que en este caso son la novia y los padres del obrero despedido.

Al acometer nuestra tarea de interpretación del estatuto, debemos tener presente aquellas normas de hermenéutica que constantemente hemos reiterado.

> . . . [E]s principio cardinal de hermenéutica que "[a]l interpretar una disposición específica de una ley, los tribunales deben siempre considerar cuáles fueron los propósitos perseguidos por la Asamblea Legislativa al aprobarla y nuestra determinación debe atribuirle un sentido que asegure el resultado que originalmente se quizo [sic] obtener". ... Nuestra obligación fundamental en estos casos, es imprimirle efectividad a la intención legislativa, propiciando de esta forma la realización del propósito que persigue la ley. ... Al interpretar y aplicar un estatuto hay que hacerlo teniendo presente el propósito social que lo inspiró .... (Citas omitidas.) *Vázquez v. A.R.P.E.*, 128 D.P.R. 513, 523 (1991). Véanse, además: *Ramírez Lebrón v. Registrador*, 131 D.P.R. 76 (1992); *Ind. Cortinera, Inc. v. P.R. Telephone Co.*, 132 D.P.R. 654 (1993); *Defendini Collazo et al. v. E.L.A., Cotto*, 134 D.P.R. 28 (1993).

"Una vez descubierto el deseo y voluntad del legislador, el fin de la interpretación ha sido logrado y no resulta necesario aplicar ninguna regla de hermenéutica, porque éstas no son sino una ayuda para determinar esa voluntad legislativa que se busca. ... Sólo hay una regla de interpre-

---

disposición se aplicará tanto a aspirantes a empleo como a aquellas personas ya empleadas por el patrono que contraigan matrimonio entre sí.

"No obstante lo dispuesto en el párrafo anterior, en aquellas situaciones en las cuales exista un claro conflicto de funciones por razón del vínculo matrimonial, que sustancialmente afecte adversamente al funcionamiento de la empresa, el patrono estará obligado a hacer un ajuste o acomodo razonable en las funciones de los empleados o aspirantes a empleo. Esta práctica será aplicable a empresas o negocios que tengan cincuenta (50) o más empleados.

"Lo anterior debe hacerse de tal forma que no afecte el derecho del patrono a reglamentar razonablemente las condiciones de trabajo de matrimonios en el mismo departamento, división o facilidades físicas.

"En esa determinación deberán considerarse los siguientes factores: tamaño de las facilidades físicas de la empresa y número de empleados, el organigrama, jerarquía y línea de mando, las necesidades físicas de la empresa y los problemas o dificultades específicos que suscitaría el matrimonio.

"El tribunal en la sentencia que dicte en acciones civiles interpuestas bajo las precedentes disposiciones podrá ordenar al patrono que reponga en su empleo al trabajador y que cese y desista del acto de que se trate." (Énfasis suplido.) Art. 1 de la Ley Núm. 100, según enmendada, *supra*, 29 L.P.R.A. sec. 146.

tación que es absolutamente invariable y ésta es que *debe descubrirse y hacerse cumplir la verdadera intención y deseo del poder legislativo.*" (Citas omitidas y énfasis suplido.) R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las Leyes en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1987, Vol. 1, Cap. 30, págs. 241–242. En esta búsqueda acudimos prioritariamente al texto de la ley, pues cuando éste es claro y libre de ambigüedad, no debe ser menospreciado bajo el pretexto de cumplir con su espíritu. Art. 14 del Código Civil, 31 L.P.R.A. sec. 14. Otra fuente que se debe consultar para descubrir la intención del legislador es el historial legislativo del estatuto en cuestión. *Caballero v. Sistema de Retiro*, 129 D.P.R. 146 (1991).

La Ley Núm. 100, *supra*, es el primer estatuto dirigido a proteger a los empleados o trabajadores contra el discrimen en la relación de empleo. Estatutos anteriores prohibían el discrimen en términos generales, pero ninguno se refería específicamente a la relación de empleo. Véanse: Ley de 27 de febrero de 1902, *Estatutos Revisados y Códigos de Puerto Rico* de 1902, págs. 297–298; Ley Núm. 131 de 13 de mayo de 1943, Leyes de Puerto Rico, págs. 405–411. La Ley Núm. 100, *supra*, pone en vigor el propósito de la Sec. 1, Art. II, de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, que repele el discrimen en el sistema jurídico puertorriqueño.[8]

---

[8] De hecho, contrario a lo que se da a entender en la opinión mayoritaria, pág. 12, al expresar que "[e]n Puerto Rico ... existe una vigorosa política pública dirigida a erradicar todo tipo de discrimen de nuestra sociedad" y que "[d]icha política pública tiene su origen en nuestra Constitución", la Comisión de Carta de Derechos de la Convención Constituyente era consciente de que la prohibición contra el discrimen no opera *ex proprio vigore*. La Comisión entendía que el propósito del Art. II, Sec. 1 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, había fijado "claramente como base circunstancial de todo lo que sigue el principio de la dignidad del ser humano y como consecuencia de ésta la igualdad esencial de todas las personas dentro de nuestro sistema constitucional" y "[obligaría] a ensanchar [las] disposiciones [de nuestra organización legal] para dar plena realización a lo aquí dispuesto". 4 Diario de Sesiones de la Convención Constituyente 2561 (1951).

La norma constitucional señala que las prohibiciones establecidas en la Constitución sólo operan contra el Estado y no contra particulares. Por lo tanto, la prohi-

En la Exposición de Motivos de la Ley Núm. 100, *supra,* se señala que su propósito es proteger a los trabajadores y aspirantes a empleo contra el discrimen en la relación de empleo.

> El creciente desarrollo industrial y progreso económico que Puerto Rico ha logrado durante los últimos años hace necesario que su Gobierno preste atención y, si pareciere aconsejable, se anticipe, a los problemas que de acuerdo con la experiencia obtenida en otros pueblos más intensamente desarrollados en el orden industrial tal desarrollo conlleva.
>
> Uno de estos problemas lo constituye la práctica, que ya comienza a observarse en Puerto Rico, *de discriminar en el empleo de personas por razones de edad exclusivamente.*
>
> .    .    .    .    .    .    .    .
>
> Se hace asimismo imperativo *legislar para dar una eficaz protección a los trabajadores contra discrímenes por razón de raza, color, religión, origen o condición social de los empleados o aspirantes a empleo.* (Énfasis suplido.) Exposición de Motivos de la Ley Núm. 100 de 30 de junio de 1959, Leyes de Puerto Rico, págs. 300–301.

De igual manera, en el debate del Sust. al P. del S. 331, proyecto que dio origen a la Ley Núm. 100, *supra*, se expresó que éste exponía la política pública del Estado de proteger a los trabajadores. "[E]sta ley va encaminada a corregir el mal social de que unas personas sean desamparadas cuando pueden hacer una aportación a la comunidad, en términos de trabajo y en uso de sus energías." XII (Núm. 54) Diario de Sesiones de la Asamblea Legislativa (Senado) de 30 de marzo de 1959, pág. 686. Sobre el discrimen por razón de edad se expresó que "lo que se quiere es

---

bición contra el discrimen en el empleo no tiene su fuente en la Constitución, sino en la Ley Núm. 100, *supra*. Esto quiere decir que si no existiera la Ley Núm. 100, *supra*, el discrimen por parte de patronos privados no estaría prohibido.

La prohibición constitucional contra el discrimen no debe usarse como fundamento para la excepción de política pública porque ésta no aplica contra terceros. No es la disposición constitucional la que le prohíbe a los patronos privados discriminar. Por lo tanto, el único fundamento para la excepción tendría que ser la Ley Núm. 100, *supra*. En la opinión mayoritaria se señala que la Ley Núm. 100, *supra*, no es fuente de remedio para los parientes. En consecuencia, no existe fundamento alguno para reconocer una excepción de política pública a favor de los parientes del empleado alegadamente discriminado por razón de origen nacional.

cumplir el propósito de que no se saque a personas que todavía pueden trabajar". Íd. Para ello se establece en la ley, como cuestión de política pública del Estado, el "tratamiento [que se] va a dar [a] una serie de actos realizados por un patrono con respecto a un empleado o un candidato a empleo". Íd., pág. 683. No se hicieron, sin embargo, manifestaciones relativas al alcance del remedio que la ley provee. *García Pagán v. Shiley Caribbean, etc.*, 122 D.P.R. 193, 200 (1988).

Durante el debate, el senador Colón Castaño cuestionó cuál habría de ser la amplitud del remedio.[9] No obstante, este asunto no se discutió y, en su lugar, se dedicó gran parte del debate a discutir si la protección de la ley aplicaría a los empleados públicos. En ese sentido, se presentó una enmienda para que los empleados públicos estuviesen cubiertos por la ley. Ésta fue derrotada. Diario de Sesiones de la Asamblea Legislativa (Senado), *supra*, págs. 684 y 688; *Rodríguez Cruz v. Padilla Ayala*, 125 D.P.R. 486 (1990).

---

[9] En XII (Núm. 54) Diario de Sesiones de la Asamblea Legislativa (Senado), 30 de marzo de 1959, pág. 682, aparece esta discusión:

"Sr. COLON CASTAÑO: Queremos significarle, compañero, que no estamos manifestándonos en contra del proyecto, porque parece ser que su argumento es en favor del proyecto. Nosotros, lo que queremos es aclarar la fraseología para que esté clara y sepamos a ciencia cierta qué es lo que vamos a votar. Me parece a mí que el Artículo primero está muy confuso, porque si bien es verdad que el compañero informa que la responsabilidad civil que aquí se señala recaería sobre el patrono que despida, suspenda, reduzca el salario, pero no es menos cierto que de acuerdo como está este proyecto, también recae sobre el patrono que no le dé empleo a una persona por razón de edad avanzada.

"Sr. CARRASQUILLO: Exacto.

"Sr. COLON CASTAÑO: *Sin especificarse en qué han de consistir los daños y cómo han de determinarse, quién ha de determinarlos.* Además, la otra pregunta al compañero es la última parte, las cuatro últimas ...

"Sr. CARRASQUILLO: Permítame indicarle que edad avanzada se define más adelante. Se dice, edad avanzada se refiere a la edad que está incluída entre los treinta y los sesenta y cinco años.

"Sr. COLON CASTAÑO: Si, eso es, de treinta y sesenta y cinco años.

. . . . . . . . .

"Compañero Carrasquillo, queremos significarle para que no vaya a interpretarse mal nuestra forma de preguntar, que estamos en simpatía con el proyecto, pero que vemos cierta confusión en el mismo proyecto. Por ejemplo, hay otra pregunta que quería hacerle: ¿Qué impacto ha de tener este proyecto con la Ley de Personal?" (Énfasis suplido.)

Por su parte, en el Informe de la Comisión de Trabajo de la Cámara de Representantes sobre el Sust. al P. del S. 331 (XII (Núm. 98) Diario de Sesiones de la Asamblea Legislativa (Cámara), 26 de mayo de 1959), se reitera, como finalidad del proyecto, la prohibición del discrimen en el empleo y, por ende, la protección a los empleados y aspirantes a empleo.([10])

Del examen del historial legislativo de la Ley Núm. 100, *supra*, podemos concluir que el propósito de la Legislatura fue prohibir el discrimen *específicamente* en la relación de empleo, proveyendo una protección particular para el empleado y aspirante a empleo. "El historial legislativo de la Ley Núm. 100, ante, revela que su objetivo principal es proteger a los empleados de la *empresa privada* contra todo tipo de discrimen." (Énfasis en el original.) *Rodríguez Cruz v. Padilla Ayala*, supra, pág. 508. "Su propósito fue dotar *a la clase obrera* con los instrumentos necesarios para protegerlos del discrimen por razón de edad, raza, color, sexo, origen social o nacional, condición social e ideas políticas o religiosas." (Énfasis suplido.) *García Pagán v. Shiley Caribbean, etc.*, supra, págs. 198–199. Véase *Cardona v. Depto. Recreación y Deportes*, 129 D.P.R. 557 (1991). Por lo tanto, aunque el historial guarda silencio sobre el alcance y contenido del remedio provisto por la ley, es evidente que toda ella, aun sus remedios, debe interpretarse a la luz de su objetivo principal: la protección a los trabajadores y aspirantes a empleo.

---

([10]) En el Informe de la Comisión de Trabajo se expresó, en lo pertinente:

"Estamos de acuerdo por completo con los fines que persigue el P. del S. 331, por entender que está encaminado a prevenir y remediar la práctica de discriminar en el empleo de trabajadores por razones de edad avanzada, raza, color, religión, origen o condición social lo cual como se señala en la exposición de motivos, comienza a vislumbrarse en el campo industrial.

"Por lo tanto, se hace imprescindible evitar su generalización por medio de legislación al efecto, para impedir que se causen graves trastornos al orden social, y que se prive a nuestra economía de un grupo trabajador tan necesario, por su experiencia y habilidades para el futuro crecimiento industrial de nuestra isla." XII (Núm. 95) Diario de Sesiones de la Asamblea Legislativa (Cámara) de 26 de mayo de 1959, pág. 1951.

28

Aunque la Ley Núm. 100, *supra*, ha sido enmendada en varias ocasiones, estas enmiendas no han alterado su esquema de remedios. Las leyes enmendatorias reafirman el objetivo principal de la Legislatura de proveer un mecanismo de protección específicamente para los trabajadores y aspirantes a empleo.[11]

---

[11] La Ley Núm. 50 de 30 de mayo de 1972 (29 L.P.R.A. secs. 146–147) incluyó la prohibición del discrimen por razón de sexo. 1972 Leyes de Puerto Rico 117. En el Informe de las Comisiones de Trabajo y Jurídico Civil del Senado sobre el P. del S. 1236, se expresó:

"El propósito es incluir el discrimen por razón de sexo entre las disposiciones de la citada Ley Núm. 100, de manera que *los empleados o aspirantes a empleo estén protegidos* también contra discrímenes por razón de sexo, y los patronos tengan responsabilidad civil y criminal si así discriminan." (Énfasis suplido.) Informe de las Comisiones del Trabajo y Jurídico Civil del Senado sobre el P. del S. 1236.

Véase, además, Informe de la Comisión de Trabajo y Asuntos del Veterano de la Cámara de Representantes sobre el P. del S. 1236, págs. 1–2.

En 1975 se volvió a enmendar la Ley Núm. 100, *supra*, para hacer extensiva la aplicabilidad a programas de aprendizaje y entrenamiento. También se le otorgaron al Secretario del Trabajo y Recursos Humanos poderes de reglamentación e investigación para hacer cumplir las disposiciones de la ley. En los informes de las comisiones legislativas relativos a los proyectos que dieron origen a esta ley, Informe de las Comisiones de Trabajo y de lo Jurídico Penal sobre el P. del S. 1263 e Informe de la Comisión de Trabajo y Asuntos del Veterano sobre el P. de la C. 1430, ambos de mayo de 1975, 7ma Asamblea Legislativa, 3ra Sesión Ordinaria, se reitera el propósito de protección a los empleados y aspirantes a empleo. "La antes citada ley [Ley Núm. 100], le ofrece cierta protección a los empleados y aspirantes a empleo contra discrímenes por parte de los patronos y organizaciones obreras. Las enmiendas que se proponen amplían sus alcances al incluir otras áreas de protección contra el discrimen, tales como programas de aprendizaje, entrenamiento, re-entrenamiento, incluyendo programas de entrenamiento en el trabajo." Informe de la Comisión de Derechos Civiles y Servicio Público del Senado sobre el P. del S. 1263, pág. 5. Véase, además, Informe de la Comisión de Trabajo y Asuntos del Veterano sobre el P. de la C. 1430, *supra*, pág. 1.

En 1977 se enmendó la ley a los efectos de que la prohibición del discrimen por razón de edad no se limitara entre las edades de treinta (30) a sesenta y cinco (65) años, sino que se incluyera desde la edad mínima en que se permite por ley trabajar. De igual manera en esta ley se reiteró su propósito de protección a la clase obrera y los aspirantes a empleo.

"La medida tiene el propósito de enmendar el título y los Artículos 1, 1A, 2 y 6 de la Ley Número 100 de 30 de junio de 1959, a los fines de proteger a los empleados y aspirantes a empleos contra discrímenes de los patronos o de las organizaciones obreras por razón de edad sin limitarla a la edad avanzada." Informe de la Comisión de Trabajo y Asuntos del Veterano de la Cámara de Representantes sobre el P. del S. 108 de 23 de mayo de 1977, 8va Asamblea Legislativa, 1ra Sesión Ordinaria, pág. 1. Véase, Informe de la Comisión de lo Jurídico del Senado sobre el P. del S. 108, e Informe de la Comisión de Gobierno del Senado sobre el P. del S. 108.

La Ley Núm. 67 de 3 de junio de 1983 (29 L.P.R.A. secs. 146–147 y 151), incluyó entre los discrímenes prohibidos aquel que ocurre por razón del origen nacional y extendió la edad protegida hasta los setenta (70) años. En el Informe Conjunto de las Comisiones de Gobierno, de Trabajo y de lo Jurídico del Senado sobre el P. del S. 929

Al enmendar la Ley Núm. 100, *supra*, la Legislatura ha reiterado, una y otra vez, que su objetivo o propósito primordial es *ofrecer una protección especial para los trabajadores y aspirantes a empleo*. No existe manifestación alguna de la Legislatura que nos permita inferir la intención de que la protección o remedios de la ley se extiendan a otras personas.

El Departamento del Trabajo y Recursos Humanos ha hecho una interpretación similar en cuanto a quiénes son las personas protegidas por la Ley Núm. 100, *supra*. A esos efectos, examinemos el Reglamento general para administrar la Ley Núm. 100, *supra*, adoptado por dicho Departamento.[12] En el Art. 2 del Reglamento se define el

---

de 20 de abril de 1983, 9na Asamblea Legislativa, 3ra Sesión Ordinaria, se reitera el objetivo principal de la ley de protección a la clase trabajadora en particular.

"A medida que han ido suscitándose situaciones que afectan al trabajador la ley se ha enmendado para convertirla en una de vanguardia que sirva a los mejores intereses de la clase trabajadora del país." Informe Conjunto de las Comisiones de Gobierno, de Trabajo y de lo Jurídico del Senado sobre el P. del S. 929, *supra*, pág. 1.

En 1991 se aprobaron dos (2) leyes para enmendar la Ley Núm. 100, *supra*. La Ley Núm. 10 de 31 de mayo de 1991 (29 L.P.R.A. secs. 146 y 150) incorporó nuestra decisión en *Olmo v. Young & Rubicam of P.R., Inc.*, 110 D.P.R. 740 (1981), a los efectos de que el término prescriptivo para-iniciar una acción bajo la ley es de un (1) año. 1991 Leyes de Puerto Rico 37. Por su parte, la Ley Núm. 116 de 20 de diciembre de 1991 (29 L.P.R.A. secs. 146–147a), prohibió el discrimen en el empleo por razón de matrimonio. 1991 Leyes de Puerto Rico 959–962. En los informes de las comisiones que estudiaron los proyectos de ley que originaron esta última pieza legislativa, se aclaró que en el caso de discrimen por razón de matrimonio, el *empleado* discriminado tiene derecho a los remedios de la Ley Núm. 100, *supra*.

"Bajo el esquema del anteproyecto aquí propuesto, *un empleado* como el envuelto en el caso de *Echlin* tendr[á] a su disposición todas las alternativas remediales provistas por la citada Ley Núm. 100, a saber: compensación por los daños causados, más reposición discrecional en el empleo con orden de cese y desista. Dicha Ley Núm. 100 también tipifica un delito menos grave para cualquier infracción a sus disposiciones." (Énfasis suplido.) Informe conjunto de las Comisiones de Trabajo y Asuntos del Veterano, de lo Jurídico Civil y de Gobierno de la Cámara de Representantes sobre el P. de la C. 1229 de 25 de octubre de 1991, 11ma Asamblea Legislativa, 6ta Sesión Ordinaria, pág. 7. Véanse: Informe de la Comisión de Trabajo, Asuntos del Veterano y Recursos Humanos del Senado sobre el P. del S. 1001 de 25 de junio de 1991, 11ma Sesión Legislativa, 5ta Sesión Ordinaria, págs. 4–5; Segundo Informe de las Comisiones de Trabajo, Asuntos del Veterano y Recursos Humanos y de lo Jurídico Civil del Senado sobre el P. del S. 1001 de 25 de octubre de 1991, 11ma Asamblea Legislativa, 6ta Sesión Ordinaria, pág. 5.

[12] "Hemos resuelto repetidamente que merece *deferencia substancial* la interpretación del organismo al cual le compete administrar un estatuto y que tal interpretación no necesita ser la única razonable para que merezca esa deferencia; basta con que sea razonable y compatible con el propósito legislativo." (Énfasis en el

término "perjudicado" como "empleado(s) o aspirante(s) a empleo contra quien(es) se haya practicado un discrimen en el empleo a tenor con la Ley 100". Art. 2 del Reglamento general para administrar la Ley Núm. 100 de 30 de junio de 1959, según enmendada, pág. 2. A fin de corregir las prácticas discriminatorias contra éstos, el Departamento ha creado un procedimiento de conciliación. De no llegar a un acuerdo con el patrono, el conciliador recomendará que se inste la acción correspondiente en los tribunales. Art. 9 del Reglamento, *supra*, págs. 7–8.

## III

Por su valor persuasivo, pasemos ahora a considerar si la controversia ante nos se ha suscitado, y ha sido resuelta, al amparo de los estatutos federales que prohíben el discrimen en el empleo. En otras ocasiones, debido a la similitud de propósitos entre ambos estatutos, al interpretar la Ley Núm. 100, *supra*, hemos adoptado algunas normas del *Age Discrimination in Employment Act* (en adelante A.D.E.A.), 29 U.S.C. sec. 621 *et seq. García Pagán v. Shiley Caribbean, etc.*, supra, pág. 202; *Odriozola v. S. Cosmetic Dist. Corp.*, 116 D.P.R. 485, 497 (1985). Sin embargo, también hemos señalado que "aunque nos beneficiamos de la experiencia en la jurisdicción federal, no estamos obligados a adoptar las interpretaciones judiciales de estas leyes análogas, particularmente cuando en Puerto Rico, a diferencia de Estados Unidos, nuestra legislación responde a una prohibición constitucional expresa contra todo tipo de discrimen".([13]) *García Pagán v. Shiley Caribbean, etc.*, su-

---

original.) *Com. Seguros P.R. v. Gen. Accident Ins. Co.*, 132 D.P.R. 543, 552–553 (1993). Véase *Rodríguez v. Depto. Servicios Sociales*, 132 D.P.R. 617 (1993).

([13]) "La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. *No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas.* Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana." (Énfasis suplido.) Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 257.

pra, pág. 202. Al igual que hicimos con la Ley Núm. 100, *supra*, examinaremos quiénes son las personas protegidas por A.D.E.A. Es decir, quiénes pueden instar una reclamación judicial para obtener los remedios que ésta provee.

La ley federal dispone que sólo la persona agraviada por una violación del estatuto podrá instar una acción judicial en reclamación de remedios. 3A *Larson's, Employment Discrimination* Sec. 102.31(a), pág. 21-276.10. Sin embargo, no define quién es "persona agraviada". "The statute allows the filing of an action by an 'aggrieved' person, but nowhere defines the term. At least one court has held that an *employee* must have suffered some damage in order to qualify." (Énfasis suplido.) Íd., pág. 21-276.13.

El Título VII del Estatuto de Derechos Civiles de 1964 (42 U.S.C. sec. 2000c *et seq.*),([14]) contiene una disposición similar.([15]) Esta ha sido interpretada liberalmente. *Larson's*, supra, Vol. 2, Sec. 49.12(a), pág. 9B-24. Sin embargo, se requiere que exista algún tipo de relación de empleo para que la reclamación pueda prosperar. "[T]here must be an employment relation, actual, potential, or past, somewhere in the picture-although it need not be between the complainant and the charged employer." *Larson's*, supra, Vol. 1, Sec. 5.21, pág. 2-5. Véase Íd., Sec. 5.21, pág. 2-9. El empleo del reclamante tiene que verse de alguna manera afectado por las prácticas discriminatorias del demandado, aunque éste no sea su patrono. "[T]he employment relationship required to establish standing under the zone of interests requirement need not be a currently existing relationship. Thus, applicants and former employees have standing to sue for violations of Title VII, as long as they have suffered an actual personal injury from the

_____

El discrimen por razón de edad, sancionado por la Ley Núm. 100, *supra*, no forma parte específica de la antes transcrita disposición constitucional.

([14]) Para una descripción general de este estatuto, véanse: 1 *Larson's, Employment Discrimination* Sec. 5.10, págs. 2-2 a 2-5; 1 *Civil Rights Act of 1991*, pág. 6 *et seq.*

([15]) 42 U.S.C. sec. 2000e(f)(1).

violation. And some courts have held that the zone of interest requirement is satisfied even though no direct employment relationship was contemplated between the plaintiff and defendant; *it is sufficient that the plaintiff was injured by actions of the defendant that interfered with plaintiff's employment relationship with another.*" (Énfasis suplido.) Íd., Vol. 2, Sec. 49.12, págs. 9B-29 a 9B-31; Íd., Vol. 1, Sec. 5.21, pág. 2.9. Por lo tanto, para poder instar una reclamación bajo el Título VII se requiere que el demandante haya sufrido algún daño en su relación de empleo debido a las prácticas discriminatorias del demandado.

Del examen de estas leyes federales podemos concluir que para reclamar los remedios de éstas se requiere que las alegadas actuaciones discriminatorias del patrono-demandado hayan perjudicado de alguna manera una relación de empleo, presente, pasada o potencial, del demandante. En ausencia de este elemento —relación de empleo— el demandante no progresará en su reclamación.

IV

Como mencionáramos anteriormente, al interpretar la Ley Núm. 100, *supra,* no podemos pasar por alto el principio general del Derecho que dispone que "[c]uando la ley es clara y libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu". Art. 14 del Código Civil, *supra.* "Cuando el legislador se ha manifestado en lenguaje claro e inequívoco, el texto de la ley es la expresión por excelencia de toda intención legislativa. *Atiles, Admor. v. Comisión Industrial,* 77 D.P.R. 16, 20 (1954). Si el lenguaje de un estatuto es tan inequívoco que postula un solo significado, un sentido cabal de ... autodisciplina judicial requiere la aplicación de la voluntad legislativa. *Clínica Juliá v. Secretario de Hacienda,* 76 D.P.R. 509, 521 (1954)". *Silva v. Adm. Sistemas de Retiro,*

128 D.P.R. 256, 259 (1991). Véanse: *Cruz Fontánez v. Registrador*, 126 D.P.R. 182 (1990); *Santiago v. Kodak Caribbean, Ltd.*, 129 D.P.R. 763 (1992); *Asoc. Hoteles y Turismo de P.R. v. E.L.A.*, 131 D.P.R. 814 (1992). "No podemos olvidar que nuestra función interpretativa no puede desvirtuar o menospreciar el lenguaje claro, so pretexto de cumplir con el espíritu de la ley." *Atlantic Pipe Corp. v. F.S.E.*, 132 D.P.R. 1026, 1030 (1993).

Un examen del texto de la Ley Núm. 100, *supra*, aclara el hecho de que la indemnización —que dispone en su Art. 1 (29 L.P.R.A. sec. 146)— es únicamente para el empleado o solicitante de empleo. La ley expresamente señala que el patrono que incurra en prácticas discriminatorias prohibidas:

(a) Incurrirá en responsabilidad civil
(1) por una suma igual al doble del importe de los daños *que el acto haya causado al empleado o solicitante de empleo. . . . (*Énfasis suplido.) Art. 1 de la Ley Núm. 100, *supra*.

Esta disposición señala, específicamente, que la responsabilidad del patrono es por los daños causados al empleado o solicitante de empleo. No nos encontramos ante una concesión general de daños por una violación de ley.[16]

En el Art. 2-A de la Ley Núm. 100, *supra*, 29 L.P.R.A. sec. 147a, se reitera este esquema de indemnización en cuanto al discrimen en programas de aprendizaje, entrenamiento o reentrenamiento. Además, el Art. 4 de la Ley Núm. 100, *supra*, 29 L.P.R.A. sec. 149, que dispone lo rela-

---

[16] Un esquema de indemnización general es el que aparece en la Sec. 2 de la Ley de Derechos Civiles de Puerto Rico, Ley Núm. 131 de 13 de mayo de 1943, según enmendada, 1 L.P.R.A. sec. 14. Ésta, a diferencia de la Ley Núm. 100, *supra*, no especifica ni el alcance de la indemnización ni quiénes pueden reclamarla.

"*Cualquier persona* perjudicada por la infracción de las secs. 13 a 19 de este título podrá instar ante el tribunal competente la correspondiente *acción civil por los daños y perjuicios que tal infracción le cause.*

"De prosperar el recurso, el tribunal impondrá en adición a la indemnización que corresponda por los daños y perjuicios causados, el pago de otra indemnización adicional, por concepto de daños punitivos." (Énfasis suplido.) Sec. 2 de la Ley Núm. 131, *supra*.

tivo a la tramitación de la acción judicial y la facultad del Secretario del Trabajo y Recursos Humanos para instarla está en entera consonancia con nuestra conclusión. Éste señala que los promoventes de la acción judicial que dispone la ley son los trabajadores, empleados o aspirantes a empleo.

> El Tribunal Superior y el Tribunal de Distrito tendrán jurisdicción original concurrente en los casos que surgieren bajo las secs. 146 a 151 de este título. Las reclamaciones civiles podrán tramitarse por acción ordinaria o mediante el procedimiento de querella establecido por la Ley Núm. 10 de 14 de noviembre de 1917, según ha sido o fuere posteriormente enmendada.
>
> *Podrán acumularse en una sola acción las reclamaciones que tuvieren varios o todos los trabajadores o empleados o aspirantes a empleo contra un patrono común o una organización obrera común.*
>
> El Secretario del Trabajo y Recursos Humanos podrá demandar, a iniciativa propia o a instancia *de uno o más trabajadores o empleados o aspirantes a empleo con interés en el asunto, y en representanción y para beneficio de uno o más de los mismos que se encuentren en circunstancias similares,* el pago de cualquier suma que se les adeude o el cumplimiento de cualquier derecho conferido por las secs. 146 a 151 de este título. Cualquier *obrero o empleado o aspirante a empleo con interés en la acción podrá intervenir en todo pleito que así se promueva por el Secretario del Trabajo y Recursos Humanos, quien igualmente podrá intervenir en toda acción que cualquier trabajador o empleado o aspirante a empleo interponga bajo los términos de las secs. 146 a 151 de este título.* (Énfasis suplido.) Art. 4 de la Ley Núm. 100, *supra.*

Por lo tanto, concluimos que el texto de la Ley Núm. 100, *supra*, establece claramente que la indemnización que dispone es únicamente para el empleado o solicitante de empleo. Esta conclusión está completamente acorde con el propósito de la ley de proteger contra el discrimen, específicamente para los trabajadores y aspirantes a empleo, según surge de su historial legislativo. Ya en *Ibáñez v. Molinos de P.R., Inc.*, 114 D.P.R. 42, 50 (1983), reconocimos que, al amparo de la Ley Núm. 100, *supra*, tiene causa de acción "toda persona que hubiese sido despedida o de otro

modo se viere negativamente afectada en su empleo por motivo de su edad, raza, color, religión, origen o condición social".

El examen del texto de la ley, su historial legislativo y nuestra jurisprudencia, nos señala que la indemnización que dispone la Ley Núm. 100 en su Art. 1, *supra*, es únicamente para aquellas personas que se vean perjudicadas en su empleo por razón de las prácticas discriminatorias del patrono. La Ley Núm. 100, *supra*, no le reconoce derecho a compensación alguna a personas que no hayan sufrido perjuicio en su empleo por razón del discrimen patronal. Por lo que concurrimos con la opinión mayoritaria en cuanto ésta concluye que la Ley Núm. 100, *supra*, es aplicable sólo a empleados o solicitante de empleo.

## V

Debemos ahora determinar si los padres de un empleado que alega haber sido objeto de discrimen por razón de origen nacional, en violación de la Ley Núm. 100, *supra*, la sociedad de gananciales compuesta por dichos padres y la novia del empleado despedido, pueden reclamar compensación al amparo del Art. 1802 del Código Civil, *supra*, por los daños que el alegado acto discriminatorio les ocasionó.[17]

El Código Civil, en su Art. 12, dispone que "[e]n las materias que se rijan por leyes especiales, la deficiencia de éstas se suplirá por las disposiciones de este título". 31 L.P.R.A. sec. 12. Al amparo de este artículo, reiteradamente hemos resuelto que "[u]na ley especial sobre determinada materia debe prevalecer sobre cualquier otro precepto aplicable que sea de carácter general. (Cita omitida.)

---

[17] El Código Civil dispone, en su Art. 1802, que "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización." Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141.

'[L]as materias especiales ... se rigen por sus leyes especiales y por el derecho jurisprudencial que se va formando en torno a los estatutos. El Código Civil, desde luego, como espina dorsal que es de nuestro derecho privado, queda siempre como acervo supletorio' ". *Rosa Resto v. Rodríguez Solís*, 111 D.P.R. 89, 94 (1981).([18])

Este artículo proviene del Art. 16 del Código Civil español.([19]) En 1974 se aprobó un nuevo Título preliminar del Código Civil español, y el Art. 16 fue sustituido por el vigente Art. 4, Núm. 3, que dispone: "[l]as disposiciones de este Código se aplicarán como supletorias en las materias regidas por otras leyes."

Los tratadistas españoles están contestes en que ambas disposiciones son sustancialmente iguales. M. Albaladejo, *Derecho Civil*, 11ma ed., Barcelona, Ed. Bosch, Vol. 1, Sec. 10, pág. 61; E. Roca Trías, "La supletoriedad del Código Civil como sistema de integración" en M. Albaladejo y S. Díaz Alabart, *Comentarios al Código Civil y compilaciones forales*, 2da ed., Madrid, Ed. Rev. Der. Privado, 1992, T. 1, Vol. 1, pág. 618; C. De la Vega Benayas, *Teoría, aplicación y eficacia de las normas en el Código Civil*, Madrid, Ed. Civitas, 1976, pág. 167; E. Lalaguna Domínguez, *Aplicación del Código Civil como derecho supletorio de otras leyes*, 1976 Rev. Der. Priv. 598, 602–603. Por lo tanto, podemos acudir al análisis que se ha hecho del vigente Art. 4,

---

([18]) Véanse, además: *Ex parte Ramos*, 53 D.P.R. 374, 377 (1938); *Caparra Country Club v. Junta de Planificación*, 74 D.P.R. 74, 82 (1952); *París v. Canety*, 73 D.P.R. 403, 406 (1952); *Albanese v. Secretario de Hacienda*, 76 D.P.R. 324, 329 (1954); *Rivera de Vincenti v. Colón*, 103 D.P.R. 560, 561 (1975); *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 263 (1980); *Ortiz v. Srio. de Hacienda*, 118 D.P.R. 571, 574 (1987).

"Cuando una materia está cubierta por una ley especial, cualquier deficiencia o insuficiencia de ésta se suple por las disposiciones del Código Civil. Así lo dispone el [Art. 12] del propio Código Civil, 31 [L.P.R.A. sec.] 12. (Citas omitidas). [También puede suplirse tal insuficiencia con otras leyes *in pari materia*.]" R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., Vol. 1, Cap. 67, pág. 441.

([19]) "En las materias que se rijan por leyes especiales la deficiencia de éstas se suplirá por las disposiciones de este Código." Art. 16 del Código Civil español.

Núm. 3, al interpretar el Art. 12 de nuestro Código Civil, 31 L.P.R.A. sec. 12.

Cuando una ley que regula una materia en particular no provee o dispone norma alguna para una situación, nos encontramos ante una deficiencia, laguna o vacío de la ley especial. En estos casos, procede acudir al Código Civil en busca de una norma que satisfaga la susodicha deficiencia. Roca Trías, *op. cit.*, pág. 618; De la Vega Benayas, *op. cit.*, pág. 169. Véanse: Sentencia de 20 de noviembre de 1908 (Núm. 86); Sentencia de 6 de diciembre de 1963 (Repertorio Aranzadi, Núm. 5215).

Sin embargo, la doctrina española ha señalado ciertos límites o condiciones al uso supletorio del Código Civil. En este sentido se ha expresado Enrique Lalaguna, en su artículo *Valor del Código Civil como derecho común después de la reforma del título preliminar*:

[S]e ha de tener en cuenta la doctrina del Tribunal Supremo sobre los límites de aplicabilidad del Código Civil en los supuestos a que se refiere el derogado artículo 16 (sustancialmente idénticos a los del vigente artículo 4to, Núm. 3). A este respecto, la jurisprudencia ha declarado que la aplicación del Código por virtud del artículo 16 supone: a) existencia de regulación legal sobre materia especial (montes, minas, aguas), por lo que no rige ni puede regir en aquellos casos en que no se señalen, por no existir, la Ley o disposición cuyos vacíos traten de llenarse con los preceptos del Código civil (sentencia de la Sala de lo Contencioso-Administrativo de 25 de marzo de 1947); b) oscuridad o insuficiencia de los preceptos de la Ley especial con referencia al caso controvertido, por lo que no debe acudirse al Código civil cuando en el cuerpo legal especial el caso es objeto de regulación con normas adecuadas (sentencias de 28 de diciembre de 1906, 14 de noviembre de 1951 y 6 de diciembre de 1963); c) imposibilidad de recurrir al procedimiento analógico, por lo que se debe excluir la aplicación del Código si la deficiencia se puede suplir por analogía de lo establecido en otras disposiciones de la Ley especial, lo que singularmente se debe tener en cuenta cuando el empleo de la analogía es, impuesto por la propia Ley especial para los casos relativos a materias en ella reguladas (cfr. sentencias de 9 de julio y 23 de marzo de 1953). 3 Documentación Jurídica 1261, 1280–1281 (1974).

De igual manera se ha señalado que la aplicación supletoria del Código Civil no puede hacerse de manera automática ante el descubrimiento de una deficiencia en la ley especial. De la Vega Benayas, *op. cit.*, pág. 173. Tiene que existir compatibilidad entre la regulación de la ley especial y la norma del Código Civil que se quiere implantar en aquélla. Íd., pág. 170. Antonio Gullón Ballesteros, en su comentario sobre la supletoriedad del Código Civil, expone:

> El apartado 3 del art. 4 consagra la supletoriedad del CC en las materias regidas por otras leyes, fórmula amplia que no hay razón para circunscribir al ámbito exclusivo de las leyes civiles, *ni obliga a todo trance a aplicarla cuando las instituciones o materias, por sus especiales características o regulación, las repela.* (Énfasis suplido.) Ministerio de Justicia, *Comentario del Código Civil*, Madrid, Ed. Secretaria General Técnica, 1991, T. 1, pág. 31.

Igual norma se ha acogido en el derecho laboral argentino: "Cuando una situación no pueda resolverse por una norma expresa o análoga del derecho laboral, es lógico remitirse para lograr el cometido a la normativa del derecho civil, *siempre que ésta no se oponga a la especial del derecho del trabajo.*" (Énfasis suplido.) E.E. Martorell, *Indemnización del daño moral por despido*, Buenos Aires, Ed. Hammurabi, 1985, pág. 113.

En diversas ocasiones hemos reiterado la norma de que se debe acudir al Código Civil para suplir deficiencias de las leyes especiales. *Wood v. Tribl. Contribuciones, y Tes., Int.*, 71 D.P.R. 233, 235 (1950); *Sierra v. Tribl. Superior*, 75 D.P.R. 841, 846 (1954); *Fuentes v. Srio. Hacienda*, 85 D.P.R. 492, 509 (1962); *Robles Menéndez v. Tribunal Superior*, 85 D.P.R. 665, 670 (1962). Así hemos acudido a éste cuando la ley especial guarda silencio sobre la situación en controversia, *Pueblo ex rel. López v. Pérez Peña*, 54 D.P.R. 804, 812 (1939); *Córdova & Simonpietri v. Crown American*, 112 D.P.R. 797, 800 (1982); o ésta no tiene disposición alguna al respecto, *Agulló v. ASERCO*, 104 D.P.R. 244, 248 (1975); *Serrano Ramírez v. Clínica Perea, Inc.*, 108 D.P.R.

477, 482 (1979); *Housing Investment Corp. v. Luna*, 112 D.P.R. 173, 177 (1982).

En *Martínez v. Llavat*, 86 D.P.R. 235 (1962), determinamos que el arrendatario de un local que está sujeto a la Ley de Alquileres Razonables y es desalojado mediante fraude o engaño, en violación a la ley, puede instar una acción judicial en reclamo por los daños que el desalojo ilegal le ocasionó. Debido a la ausencia de disposición al respecto en la Ley de Alquileres Razonables, 17 L.P.R.A. secs. 181–198 y 200–214, acudimos al Código Civil en busca de la normativa necesaria para imponer responsabilidad al arrendador por los daños que su actuación ocasionó. Expresamos que era correcta la aplicación supletoria del Código Civil con relación a la Ley de Alquileres Razonables, porque en esta última no existía una disposición contraria a la normativa del Código que se pretendía implantar. Allí señalamos que "el hecho de que la Ley de Alquileres Razonables no disponga de manera expresa una indemnización por los actos culposos del arrendador no quiere decir, *en ausencia de disposición en ella en contrario*, que no quepa indemnización si tales actos causaron daño. El Art. 12 del Código Civil (ed. 1930) estatuye que en las materias que se rijan por leyes especiales, las deficiencias de éstas se suplirán por las disposiciones de dicho Código. (Citas omitidas.) Así los demandados vienen obligados a responder al demandante en los daños causados por los actos suyos culposos que surgen del récord, bajo los Arts. 1042, 1045 y 1802 del Código Civil". (Escolio omitido y énfasis suplido.) *Martínez v. Llavat*, supra, pág. 247. De estas expresiones surge el requisito de compatibilidad como condición para la aplicación supletoria del Código Civil.

Al examinar la Ley Núm. 100, *supra*, tenemos que concluir que ésta no tiene disposición alguna referente a una compensación a los parientes del empleado discriminado. Esto puede considerarse una omisión o deficiencia de la ley especial. Por ende, en virtud del Art. 12 del Código Civil,

*supra,* podemos acudir a ese cuerpo en busca de la norma que falta en la ley especial. Los recurridos nos instan a aplicar de manera supletoria el Art. 1802, *supra,* como vehículo de indemnización de los padres y de la novia del empleado. Sin embargo, existe un obstáculo a este uso supletorio del Art. 1802, *supra,* con relación a la Ley Núm. 100, *supra:* la falta de compatibilidad entre ambos.

Según expresamos antes, el texto e historial legislativo de la Ley Núm. 100, *supra,* es claro en su propósito de que la protección que provee es para el empleado y aspirante a empleo. La inclusión del Art. 1802, *supra,* en el esquema de la Ley Núm. 100, *supra,* es contraria al propósito de ésta y tendría el efecto de desvirtuarla.[20] La Ley Núm. 100, *supra,* por sus características y regulación especial para el área laboral, repele la aplicación supletoria del Art. 1802, *supra,* según la proponen los recurridos y acoge este Tribunal. Inexplicablemente, la opinión de la mayoría, después de señalar que el objetivo fundamental de la Ley Núm. 100, *supra,* es proveer una protección contra el discrimen a los trabajadores y aspirantes a empleo específicamente, y que ésta "[n]o tiene, pues, nada que ver con terceros u otras personas que no sean empleados" —(énfasis suprimido) opinión mayoritaria, pág. 5— pasa a concluir que los "derechos de los parientes ... constituyen una normativa independiente que surge por su propia cuenta al amparo del Art. 1802 del Código Civil . . .". Íd., págs. 5–6. Dicha conclusión está en franca contradicción con el esquema de remedios que ha dispuesto la Legislatura en el área laboral. Ello ocasiona que esta decisión se constituya en un elemento demoledor del cuidadoso entramado legis-

---

[20] Aunque en *García Pagán v. Shiley Caribbean, etc.* supra, págs. 207–208, se expresó que la causa de acción que dispone la Ley Núm. 100, *supra,* es de igual amplitud que la acción civil de daños y perjuicios provista por la Ley de Derechos Civiles, este señalamiento se hizo a los únicos fines de establecer que el término "daños" en la Ley Núm. 100, *supra,* incluye la compensación por sufrimientos y angustias mentales al empleado o aspirante a empleo. Íd., pág. 215. Por lo tanto, consideramos impropio utilizar la opinión de *García Pagán v. Shiley Caribbean, etc.,* supra, para prejuzgar la controversia ante nos hoy.

lativo de la Ley Núm. 100, *supra*.[21] Consideramos que los tribunales no son el foro apropiado para, mediante fíat interpretativo, ampliar, de manera considerable la responsabilidad de los patronos con relación a las leyes laborales, desvirtuando de esta forma los esquemas remediales establecidos por la Legislatura.[22]

No podemos suscribir la opinión que emite la mayoría, y concluimos que los parientes de un empleado que alega

---

[21] Además, es claramente anticipable que esta decisión tiene el potencial para alterar el diseño legislativo de otras leyes laborales que disponen remedios similares a la Ley Núm. 100, *supra*, trayendo de esta manera graves repercusiones que van mucho más allá del contexto de la Ley Núm. 100, *supra*. Entre estas leyes se encuentran las siguientes: Sec. 4 de la Ley Núm. 3 de 13 de marzo de 1942, Ley de Madres Obreras, 29 L.P.R.A. sec. 469; Art. 1 de la Ley Núm. 382 de 11 de mayo de 1950, que prohíbe el despido por motivaciones políticas, 29 L.P.R.A. sec. 136; Sec. 24 de la Ley Núm. 96 de 26 de junio de 1956, que prohíbe el despido por instar una reclamación contra el patrono o cooperar en una investigación al amparo de la Ley de Salario Mínimo, de cualquier otra ley laboral o participar en un comité de salario mínimo, 29 L.P.R.A. sec. 245w; Ley Núm. 87 de 26 de junio de 1964, que prohíbe el despido porque el empleado ha sido llamado a servir como jurado, 29 L.P.R.A. sec. 152; Art. 3-A de la Ley Núm. 49 de 22 de mayo de 1968, que prohíbe el despido de un empleado por negarse a levantar objetos que excedan el peso máximo establecido por la ley, 29 L.P.R.A. sec. 355a; Art. 24 de la Ley Núm. 5 de 30 de diciembre de 1986, Ley de Sustento de Menores, que prohíbe el despido de un empleado por haber autorizado una retención de salario para el pago de pensiones alimentarias o por haber sido requerido por el tribunal al patrono a hacer tal retención, 8 L.P.R.A. sec. 523(14); Art. 3 de la Ley Núm. 69 de 6 de julio de 1985, que prohíbe el despido por razón de sexo, 29 L.P.R.A. sec. 1323; Ley Núm. 17 de 22 de abril de 1988, que prohíbe el despido por rechazar conducta del patrono constitutiva de hostigamiento sexual, 29 L.P.R.A. sec. 1566.

[22] La opinión mayoritaria, pág. 10, expresa que nuestro tribunal "[e]n numerosas ocasiones [ha] reconocido que una persona tiene derecho a una indemnización por los sufrimientos, los trastornos morales o las angustias mentales que haya experimentado a consecuencia de los daños materiales o de otra índole que, a su vez, le hayan causado de forma directa a sus parientes". En su apoyo citan: *Muriel v. Suazo*, 72 D.P.R. 370 (1951); *Vda. de Valentín v. E.L.A.*, 84 D.P.R. 112 (1961); *Travieso v. Del Toro y Travieso, Int.*, 74 D.P.R. 1009 (1953); *Berríos v. International General Electric*, 88 D.P.R. 109 (1963); *Concepción Guzmán v. A.F.F.*, 92 D.P.R. 488 (1965); *Cirino v. Fuentes Fluviales*, 91 D.P.R. 608 (1964); *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443 (1985); *Vda. de Delgado v. Boston Ins. Co.*, 99 D.P.R. 714 (1971); *Santiago v. Sears Roebuck*, 102 D.P.R. 515 (1974); *Ferrer v. Lebrón García*, 103 D.P.R. 600 (1975); *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721 (1984); *Soc. de Gananciales v. El Vocero de P.R.*, 135 D.P.R. 122 (1994); *Maldonado v. Municipio de Ponce*, 39 D.P.R. 247 (1929). Todos estos casos son distinguibles de la situación en el caso de autos: (1) no son casos que involucran leyes especiales del ámbito del derecho laboral; (2) no se refieren al asunto del derecho del parientes a compensación por los daños directos que se le ocasionaron a una persona; (3) el pariente fue víctima directamente de la actuación torticera del demandado, y (4) son casos que se refieren a causas de acción bajo el Art. 1802 del Código Civil, *supra*, y, por lo tanto, distinguibles del de autos que se fundamenta en la Ley Núm. 100, *supra*.

haber sido objeto de discrimen por razón de nacionalidad, en violación de la Ley Núm. 100, *supra,* no tienen derecho a reclamar una compensación, en virtud del Art. 1802 del Código Civil, *supra,* por los daños que el discrimen alegadamente les ocasionó.

Por los motivos antes expuestos, confirmaríamos la resolución emitida por el Tribunal Superior, Sala de Aguadilla, de 22 de abril de 1993.